[No. S156961. June 18, 2009.]

SAN LEANDRO TEACHERS ASSOCIATION et al., Plaintiffs and Respondents, v.
GOVERNING BOARD OF THE SAN LEANDRO UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.

824

826

## COUNSEL

Littler Mendelson, Garry G. Mathiason, Kimberly L. Owens and Olga Savage for Defendants and Appellants.

James S. Burling and Harold E. Johnson for Pacific Legal Foundation and National Tax Limitation Committee as Amici Curiae on behalf of Defendants and Appellants.

Liebert Cassidy Whitmore, Bruce A. Barsook, David A. Urban and Didier Y. Reiss for California School Boards Association, Association of California School Administrators and School Employers Association of California as Amici Curiae on behalf of Defendants and Appellants.

Ruiz & Sperow, Celia M. Ruiz and David E. Lyon for Association of California School Administrators as Amicus Curiae on behalf of Defendants and Appellants.

California Teachers Association, Priscilla S. Winslow, Joseph R. Colton, Beverly Tucker, Ballinger G. Kemp and Ramon E. Romero for Plaintiffs and Respondents.

Michael R. Clancy and Christina C. Bleuler for California School Employees Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Rothner, Segall & Greenstone, Glenn Rothner, Lisa C. Demidovich and Jonathan Cohen for American Federation of State, County and Municipal Employees and Service Employees International Union Local 99 as Amici Curiae on behalf of Plaintiffs and Respondents.

Julia Harumi Mass, Alan L. Schlosser; David Blair-Loy; and Peter Eliasberg for American Civil Liberties Union of Northern California, American Civil

Liberties Union of San Diego and Imperial Counties and American Civil Liberties Union of Southern California as Amici Curiae on behalf of Plaintiffs and Respondents.

The Thomas Jefferson Center for the Protection of Free Expression, Robert M. O'Neil and J. Joshua Wheeler as Amici Curiae on behalf of Plaintiffs and Respondents.

Law Offices of Robert J. Bezemek, Robert J. Bezemek, Patricia Lim and David Conway for The California Federation of Teachers, The Faculty Association of the California Community Colleges and The California Community College Independents Organization as Amici Curiae on behalf of Plaintiffs and Respondents.

---

## OPINION

**MORENO, J.**—Shortly before an election, an employee organization that represents school teachers, and which regularly communicates with its members through school mailboxes, sought to distribute literature through these mailboxes that included endorsements of certain school board candidates. The school district administration refused to permit such political communication and the employee organization sought a writ of mandate to have that policy overturned. In order to resolve whether a writ should properly issue in this case, we must construe the meaning of Education Code section 7054, subdivision (a), which prohibits the use of "school district . . . funds, services, supplies or equipment" for urging the support or defeat of political candidates or ballot propositions. The trial court sided with the employee organization but the Court of Appeal reversed, upholding the school district's policy as within the scope of section 7054. It also determined that the policy did not violate Government Code section 3543.1, subdivision (b), which gives school employee organizations the right to use internal mailboxes subject to "reasonable regulation," concluding that the school district's policy was a reasonable regulation. The Court of Appeal also held that the policy did not violate the United States or California Constitutions.

We conclude that the Court of Appeal is correct and therefore affirm its judgment denying the employee organization's request for a writ of mandate.

### I. STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

The essential facts underlying this case are not in dispute. The San Leandro Teachers Association (SLTA) is the exclusive bargaining representative of the San Leandro Unified School District's (District) certificated employees. Each

certificated employee is assigned a mailbox. The normal intended purpose of the school mailboxes is to communicate with teachers and staff regarding school-related matters. As a representative employee organization, SLTA is authorized to use the mailboxes to communicate with its employee members pursuant to Government Code section 3543.1, subdivision (b), a part of the Educational Employment Relations Act (EERA; Gov. Code, § 3540 et seq.) and the collective bargaining agreement. Nonschool organizations do not have direct access to these mailboxes and may not access them without the District's prior approval. The mailboxes are permanent fixtures at each school, consisting of a wooden or metal frame grid that is fixed to the wall in school offices.

On October 11 and 12, 2004, SLTA distributed two employee newsletters by placing them in internal faculty mailboxes located at the District's schools. The first newsletter, entitled "SLATE," was a two-page memorandum from SLTA's president. In addition to discussing health benefits and a recently filed unfair labor practice charge regarding unilateral staff reduction, the memorandum included a paragraph about the upcoming school board election. The paragraph mentioned by name two SLTA-endorsed school board candidates and referred to the success of SLTA volunteer efforts and of a "Meet the Candidate" night; it also urged more volunteer effort. Another paragraph in the same memorandum described SLTA's political efforts in more general terms.

The second newsletter is a one-page memorandum addressed to SLTA's members, entitled "From the Table." In addition to discussing salary and benefits, negotiation of procedures for evaluating employees, and other matters, the memorandum states: "Support your Bargaining Team's efforts to improve your salaries and working conditions. Please volunteer to phone or walk in support of our endorsed School Board Candidates. Our next bargaining date is October 29." Both newsletters were produced entirely at SLTA expense and were placed in the mailboxes by SLTA volunteers during their nonwork hours.

On October 15, 2004, Assistant Superintendent Martinez sent a letter to the president of SLTA advising him that the union was prohibited by Education Code section 7054 from using school district mail facilities to distribute materials that contain political endorsements. Because of that statutory prohibition, "we will not allow the SLTA access to faculty mailboxes if any future distributions contain impermissible political endorsements."

On November 16, 2004, SLTA filed an unfair practice charge with the Public Employee Relations Board (PERB), alleging that the District violated provisions of the EERA by prohibiting SLTA from using the school mailboxes to distribute union newsletters containing its political endorsements.

On June 28, 2005, PERB adopted an earlier decision of one of its agents, dismissing the unfair practice charge. The agent had determined that "the plain meaning of [Education Code section 7054] prohibited the use of mailboxes as a means of distributing political information." The agency also relied on one of its own earlier decisions, which held that a school's internal mail system amounted to "services" or "equipment" within the meaning of Education Code section 7054.

On September 30, 2005, SLTA filed a petition for peremptory writ of mandate to cause appellants to "cease and desist from enforcing a policy which forbids [respondents] from placing in the school mailboxes any materials generated by the [SLTA] which contain references to candidates for public office or ballot initiatives." The District demurred to the writ petition, asserting that prohibiting the distribution of partisan political material via the mailboxes is both constitutional and mandated by Education Code section 7054.

On May 3, 2006, the trial court granted the writ petition and overruled appellants' demurrer. Subsequently, the court awarded respondents their attorney fees under Code of Civil Procedure section 1021.5. For reasons discussed at length below, the Court of Appeal reversed, concluding both that Education Code section 7054 compelled the District's policy and that the statute and policy were not unconstitutional. We granted review.

## II. DISCUSSION

### A. *The Statutory Question*

We begin by examining the statute in dispute. Education Code section 7054[1] is part of the statutory scheme regulating the political activities of school districts and employees. It provides: "(a) No school district or community college district funds, services, supplies, or equipment shall be used for the purpose of urging the support or defeat of any ballot measure or candidate, including, but not limited to, any candidate for election to the governing board of the district; [¶] (b) Nothing in this section shall prohibit the use of any of the public resources described in subdivision (a) to provide information to the public about the possible effects of any bond issue or other ballot measure if both of the following conditions are met: [¶] (1) The informational activities are otherwise authorized by the Constitution or laws of this state. [¶] (2) The information provided constitutes a fair and impartial presentation of relevant facts to aid the electorate in reaching an informed judgment regarding the bond issue or ballot measure. [¶] (c) A violation of

---

[1] All statutory references are to this code unless otherwise indicated.

this section shall be a misdemeanor or felony punishable by imprisonment in the county jail not exceeding one year or by a fine not exceeding one thousand dollars ($1,000), or by both, or imprisonment in a state prison for 16 months, or two or three years."

■ " 'When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citation.] 'In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.' [Citation.] At the same time, 'we do not consider . . . statutory language in isolation.' [Citation.] Instead, we 'examine the entire substance of the statute in order to determine the scope and purpose of the provision, construing its words in context and harmonizing its various parts.' [Citation.] Moreover, we ' "read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' " ' " (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043 [12 Cal.Rptr.3d 343, 88 P.3d 71].)

■ In construing the statutory language, we first note that section 7054 cannot be construed to ban the use of all public resources for political purposes. Subdivision (a) of section 7054 bans the use of "funds, services, supplies, or equipment" for certain political purposes, whereas subdivision (b) states that "[n]othing in this section shall prohibit the use of any *of the public resources described in subdivision (a)* to provide information to the public about the possible effects of any bond issue or other ballot measure if both of the following conditions are met." (Italics added.) The italicized language of subdivision (b) therefore makes clear that the public resources described in subdivision (a) are a subset of all public resources.

The parties argue about whether a school mailbox constitutes "services" within the meaning of section 7054. The District contends, and the Court of Appeal found, that mailboxes provide a service to those who use them, and that otherwise SLTA would have to use the more costly United States mail or some other means to deliver its message. SLTA argues in effect that the term "services" generally connotes useful activity performed by a human agency, i.e., that while distribution of mail is a service, the mailboxes themselves do not constitute a service. Thus, because the literature in question was distributed by SLTA, no public "service" was used. The dictionary definition of "service" does give some support to SLTA's position. That word has been most relevantly defined as: "1 a: the occupation or function of serving <in active [service]> b: employment as a servant <entered his [service]> 2 a: the work performed by one that serves <gives good [service]> b: HELP, USE, BENEFIT <be of [service] to them> c: contribution to the welfare of others

d: disposal for use <put the capability of the entire system at your service> . . . . 4: the act of serving: as a: a helpful act <did him a [service]> b: useful labor that does not produce a tangible commodity—usually used in plural <charge for professional [service]*s*>." (Webster's 9th New Collegiate Dict. (1987) p. 1076.)

Similarly, the parties disagree about whether a school mailbox constitutes "equipment." The District, like the Court of Appeal, construes the word broadly, and contends in essence that such mailboxes are self-evidently "equipment." As the Court of Appeal stated: "We . . . believe that the mailboxes themselves constitute school district 'equipment' in that they are tangible, specially constructed receptacles that, while not unduly expensive, are created and maintained solely by the district. And unlike tables, which can serve many functions, mailboxes are solely dedicated to the task of distributing information to individual recipients." SLTA argues the contrary. In the words of amicus curiae California School Employees Association: " '[E]quipment' connotes an object that is handled, used or operated, such as a copying machine or a printer: a mailbox does not fit within this category." Moreover, SLTA and its amici curiae argue that unlike a copying machine or printer and other common examples of equipment, which generate costs in terms of depreciation and the utilization of supplies, the use of the mailbox is virtually without cost, and therefore not within the purview of the statute primarily concerned with the expenditure of public funds for political campaigns. They further point to the District's apparent concession that a table in a faculty lounge, for example, on which the union's political literature rested, was not "equipment" within the meaning of section 7054.[2]

■ Because neither side makes a compelling case for its construction of section 7054 based on the language of the statute alone, we may consider

---

[2] Neither side cites the dictionary definitions of "equipment," and these are not particularly helpful in deciding the question. The dictionary assigns the word several meanings, most pertinently, "1. a: the set of articles or physical resources serving to equip a person or thing: as (1): the implements used in an operation or activity: APPARATUS (2): all the fixed assets other than land and buildings of a business enterprise . . . b: a piece of such equipment." (Webster's 9th New Collegiate Dict., *supra*, p. 421.) From the broadest definition above, staff mailboxes might be considered "equipment" because they could be considered "fixed assets other than land and buildings." On the other hand, "[f]ixed assets" have been defined as "[t]he tangible, long-lived assets of the business including land, buildings, furniture, fixtures, and equipment." (Pollard et al., Principles of Accounting (2007) G-6.) Thus, defined broadly "fixed assets" other than land and buildings include "furniture" and "fixtures," and therefore under that broad definition, "fixtures" and "furniture" would be considered "equipment." But as the above definition of "fixed assets" illustrates, "furniture" and "fixtures" are commonly thought of as distinct from "equipment" and therefore the three terms are listed in the conjunctive. It is thus not entirely clear from the statutory language of section 7054 whether school mailboxes are "fixtures" rather than equipment in the sense that they are attached to a building (see Black's Law Dict. (5th ed. 1979) p. 574) or whether "equipment" was intended broadly to include such fixtures.

various extrinsic aids, including legislative history and an examination of the objectives to be achieved, in order to discern legislative intent. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) The statute was initially enacted in 1977, and the parties agree that it was a legislative response to *Stanson v. Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1] (*Stanson*), which held that government agencies could not use public funds to campaign for ballot propositions or candidates, at least not without explicit legislative authorization. As we stated in *Stanson*, "the use of the public treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave[s] to the 'free election' of the people (see Cal. Const., art. II, § 2) . . . present[s] a serious threat to the integrity of the electoral process." (*Stanson, supra*, 17 Cal.3d at p. 218.)

As we further explained in *Stanson*: "Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office (see, e.g., Madison, The Federalist Papers, Nos. 52, 53; 10 Richardson, Messages and Papers of the Presidents (1899) pp. 98–99 (President Jefferson)); the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process." (*Stanson, supra*, 17 Cal.3d at p. 217.)

As originally enacted in 1977, section 7054 sought to limit the scope of the *Stanson* decision. It stated: "Except as provided in Sections 7056, 35174 and 72632, no school district or community college district funds, services, supplies, or equipment shall be used for the purpose of urging the passage or defeat of any school measure of the district, including, but not limited to, the candidacy of any person for election to the governing board of the district." (Stats. 1977, ch. 36, § 396.5, p. 281.) Former section 35174, however, created a large loophole: It provided in pertinent part: "The governing board of any school district or any member of the governing board of a school district may prepare or disseminate information or may make public or private appearances or statements for the purpose of urging the passage or defeat of any school measure of the district." (Stats. 1976, ch. 1010, § 2, pp. 2384, 3071.)

In 1995 section 7054 was amended in conjunction with the repeal of former section 35174, and more expressly incorporated the principles set forth in *Stanson*. Section 1 of the new statute stated in part: "(a) The

Legislature hereby finds and declares that, in a democratic society, the use of public funds in election campaigns is unjustified and inappropriate. No public entity should presume to use money derived from the whole of taxpayers to support or oppose ballot measures or candidates. [¶] (b) However, it is not the intent of the Legislature, in enacting this act, to restrict the political activities of officers or employees of a school district or community college district except as provided in Article 2 (commencing with Section 7050) of Chapter 1 of Part 5 of the Education Code or as may be necessary to meet specified requirements of federal law. . . . The right of speech of any member of a governing board of a school district or community college district or any employee thereof is in no manner affected by this act." (Stats. 1995, ch. 879, § 1, p. 6695.)

Legislative analysis made clear the purpose of the amended statute: "Proponents argue that in general, public funds or resources may not be used for political purposes. Members of the Legislature, for instance, are prohibited from using legislative funds, resources or personnel time for political purposes, including partisan political activity and advocacy of, or opposition to, ballot measures. Local government officials are bound by similar prohibitions. Members of school and community college district governing boards, however, have been exempted from this general rule since 1977. Education Code Section 35174, enacted in 1976, authorizes the use of public resources and employee time for the purpose of urging the support or defeat of school board candidates, school bond measures and any other school ballot measure. This constitutes an inappropriate use of public funds. Taxpayers' money should not be used for political purposes, whether in state, county, city, special district or school district elections. [¶] Proponents note that members of school and community college district governing boards have a legitimate role in addressing the public about bond measures and other related issues. This bill does not in any way abridge their constitutional right to continue to speak about these issues. Nor does it prevent them from raising money for political purposes or advocating on behalf of ballot measures or individual candidates. The bill does, however, repeal the authorization for school board members to use for political purposes district telephones, copying machines, equipment, employees, and materials produced with taxpayer monies." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 82 (1995–1996 Reg. Sess.) as amended Aug. 31, 1995, pp. 5–6.)

■ Two aspects of the above legislative history are noteworthy. First, it refers to "materials produced with taxpayer monies," which school mailboxes clearly are. Second, and more significantly, as the legislative history of section 7054 makes clear, it was designed to avoid the use of public resources to perpetuate an incumbent candidate or his or her chosen successor, or to promote self-serving ballot initiatives, thereby compromising the integrity of

the electoral process. The District contends that permitting employee organizations to use the mailboxes to endorse school board candidates will unfairly advantage those organizations and the candidates they endorse, because it allows them, but not other candidates and organizations, to use the mailboxes to communicate with teachers about these endorsements. We agree that this special access to an internal channel of communication to influence elections is a potential abuse that section 7054, and the *Stanson* decision, were designed to guard against. (See also *Vargas v. City of Salinas* (2009) 46 Cal.4th 1 [92 Cal.Rptr.3d 286, 205 P.3d 207] [reaffirming *Stanson*'s basic principles].) Therefore we conclude, consistent with the purpose of section 7054, that the broad term "equipment" was intended to encompass mailboxes specially constructed at taxpayer expense to serve as a school's internal communication channel, which one group may not use to its exclusive political advantage. We agree with the Court of Appeal that, unlike school furniture, for example, which may be incidentally used for a host of different purposes, the term "equipment" is plausibly applied to fixtures dedicated to a specific use.

SLTA, in arguing that section 7054 is not implicated, cites an Attorney General opinion construing section 7054, found at 84 Ops.Cal.Atty.Gen. 52 (2001). There, the Attorney General addressed the question of whether section 7054 prohibited a school district from making employee payroll deductions for a political action committee established by a representative employee organization. The Attorney General's opinion interpreted section 7054 not to apply when a school district merely transfers nonpublic money from employees to a nongovernmental organization like a political action committee. (84 Ops.Cal.Atty.Gen., *supra*, at pp. 53–54.) As the District points out, the Attorney General's opinion has been critiqued by PERB for neglecting the fact that section 7054 is not only concerned with public funds but also with services, and for failing to come to terms with the fact that payroll deductions are a service. (*American Federation of Teachers Guild v. San Diego Community College Dist.* (2001) PERB Dec. No. 1467 [26 PERC P33014].)[3] In any case, there is no basis in the language of section 7054 for concluding it applies to school districts but not employee organizations. Indeed, SLTA appears to concede in its briefing that, had it used school copying machines or printers to produce its political literature, or used on-duty school personnel to distribute that literature, it would have run afoul of that statute.

---

[3] We express no opinion as to whether the Attorney General's opinion discussed above was correct in its result. We note that the issue requires not only an analysis of the scope of section 7054, but also of those statutes that authorize government employee payroll deductions for union dues and other services. (See, e.g., Gov. Code, §§ 1157.1, 1157.3.)

Nor is a construction of section 7054 to ban placing candidate endorsements in school mailboxes inconsistent with Government Code section 3543.1, subdivision (b). That statute states: "Employee organizations shall have the right of access at reasonable times to areas in which employees work, the right to use institutional bulletin boards, *mailboxes*, and other means of communication, subject to *reasonable regulation*, and the right to use institutional facilities at reasonable times for the purpose of meetings concerned with the exercise of the rights guaranteed by this chapter." (Italics added.)

■ The term "reasonable regulation" is not defined. In reference to an almost identically worded provision of the Higher Education Employer-Employee Relations Act (Gov. Code, §§ 3560–3599)—Government Code section 3568—one court has stated: "To assess the reasonableness of a particular regulation, the Board must balance, in light of applicable public policies, the benefits conferred by the regulation and the burdens it imposes." (*Regents of University of California v. Public Employment Relations Bd.* (1990) 220 Cal.App.3d 346, 361 [269 Cal.Rptr. 563].) Thus, the inquiry into reasonableness is necessarily contextual. On the one hand, a school district is given the discretion to regulate mailbox access so that it does not interfere with the district's legitimate interests. On the other hand, since the statute speaks of a *"right* of access" by employee organizations to mailboxes, the regulations in question should not unreasonably interfere with such access.

■ "When two statutes touch upon a common subject, they are to be construed in reference to each other, so as to 'harmonize the two in such a way that no part of either becomes surplusage.' [Citations.] Two codes ' "must be read together and so construed as to give effect, when possible, to all the provisions thereof." ' " (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778–779 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) In the present case, there seems little question that a regulation that bans candidate endorsements pursuant to section 7054 to preserve the integrity of the electoral process is a reasonable regulation pursuing a legitimate statutory objective. Moreover, such a regulation would not unduly limit a union's statutory right of access. Government Code section 3543.2 defines the scope of union representation as limited to "matters relating to wages, hours of employment, and other terms and conditions of employment." As we have recognized, school districts are not compelled to bargain about, nor are school employees compelled to contribute to, matters or activities outside the scope of union representation. (See *Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 593–594 [262 Cal.Rptr. 46, 778 P.2d 174].) That is not to say that public employee unions do not have an important political dimension, given that they are governed by and negotiate with government entities. (See *Abood v. Detroit Board of Education* (1977) 431 U.S. 209, 228 [52 L.Ed.2d 261, 97 S.Ct. 1782].) Here, however, the SLTA still has numerous alternative channels with which to communicate its views to its members. The regulation

of school mailboxes to disallow candidate endorsements and to counter the advantage that those with special access to those mailboxes may possess would not interfere with a teachers union's core mission of advocating for its members.

■ We therefore hold that the District's regulation in the present case is lawful. We emphasize the narrowness of the holding. We do not hold that school districts are compelled to exclude candidate endorsements from school mailboxes. Indeed, section 7058, part of the same article as section 7054, states: "Nothing in this article shall prohibit the use of a forum under the control of the governing board of a school district or community college district if the forum is made available to *all sides on an equitable basis.*" (Italics added.) A school mailbox is a forum of communication, albeit, as discussed in the next part of this opinion, a nonpublic one, that is within the control of the school district. Section 7058 makes clear that section 7054 does not prohibit a school board from opening up mailboxes to political endorsement literature, as long as this is done "on an equitable basis."

■ Furthermore, our holding does not extend to union literature in school mailboxes that does not "urg[e] the support or defeat of any . . . candidate" within the meaning of section 7054, but merely urges members to become involved in upcoming elections and informs them how to do so, or engages in public policy discussion in more general terms.[4] We note that a school district's ability to control the political communication of its employees is limited by section 7052, part of the same article as section 7054, which states: "Except as otherwise provided in this article, or as necessary to meet requirements of federal law as it pertains to a particular employee or employees, no restriction shall be placed on the political activities of any officer or employee of a local agency."[5] We hold only that a rule prohibiting candidate endorsement literature in school mailboxes is a "reasonable regulation" within the meaning of Government Code section 3543.1, subdivision (b) because it enforces the directive of section 7054.

---

[4] Nor do we consider literature in mailboxes that endorses ballot propositions rather than candidates, an issue not before us. We note that Education Code section 7056, subdivision (b), a part of the same article as section 7054, provides in pertinent part: "Nothing in this section shall be construed to prohibit any recognized employee organization or its officers, agents, and representatives from soliciting or receiving political funds or contributions from employee members to promote the support or defeat of any ballot measure on school district property or community college district property during nonworking time." How that statute's authorization of union campaigning with its members on school property for or against ballot propositions is to be read in conjunction with section 7054 is a question we need not and do not address.

[5] Of course, union literature on whatever topic remains subject to reasonable regulation pursuant to Government Code section 3543.1, subdivision (b), including regulations reasonably limiting the quantity of material that can be placed in mailboxes.

## B. *The Constitutional Question*

The constitutional issue, as framed by SLTA in its petition for review, is as follows: "Does the guarantee of liberty of speech in Article I, section 2 of the California Constitution assure that an employee organization may distribute its messages to its members concerning electoral politics by school mailboxes free from school district censorship?" Another way of phrasing the above question is this: Does the District's regulation prohibiting employee organizations from placing candidate endorsement literature in school mailboxes violate the California Constitution?

The above question indicates that SLTA is not relying on the First Amendment to the United States Constitution, and implies that SLTA's claim would fail under First Amendment doctrine as articulated by the United States Supreme Court. That implication indeed appears to be correct. Below we will first discuss how this case would be analyzed under federal First Amendment jurisprudence, and then address SLTA's arguments that we should adopt a different and more favorable analysis under California's liberty of speech clause. Because the Court of Appeal set forth the proper First Amendment analysis, based on the public forum doctrine, we incorporate their discussion below.

### 1. *Analysis Under the First Amendment*[6]

■ As the scope of permissible regulations of speech varies depending on the nature of the forum, it is essential to determine which forum applies to this case. As [[we have]] noted, "For purposes of [a] forum analysis the high court has divided all public property into three categories. The first is the traditional public forum—i.e., a place that by long tradition has been used by the public at large for the free exchange of ideas." (*Clark v. Burleigh* (1992) 4 Cal.4th 474, 482 [14 Cal.Rptr.2d 455, 841 P.2d 975].) Public streets and parks are prototypical public forums. (*Id.* at p. 482.)

■ Regulations restricting speech in public forums must satisfy exacting tests in order to pass constitutional muster: "In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. [Citation.] The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample

---

[6] Except for the final paragraph, the following part of this opinion (pt. II.B.1) is quoted from the Court of Appeal opinion, with double brackets indicating our additions. (See *Arriaga v. County of Alameda* (1995) 9 Cal.4th 1055, 1059 [40 Cal.Rptr.2d 116, 892 P.2d 150].)

alternative channels of communication." (*Perry Ed. Assn. v. Perry Local Educators' Assn.* [[(1983)]] 460 U.S. 37, 45 [[74 L.Ed.2d 794, 103 S.Ct. 948]].)

 "The second category of public property is the designated public forum, whether of a limited or unlimited character—property that the [[S]]tate has opened for expressive activity by part or all of the public."[7] (*International Soc. for Krishna Consciousness, Inc. v. Lee* (1992) 505 U.S. 672, 678 [120 L.Ed.2d 541, 112 S.Ct. 2701].) "The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. [Citations.] Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. 37, 45–46, fn. omitted.) Thus, regulations of expression in the context of a designated public forum must satisfy the same standards as those that apply in the context of a public forum.

 " 'Finally, there is all remaining public property' [citation], a category usually referred to as the 'nonpublic forum.' 'Limitations on expressive activity conducted on this last category of property must survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view.' [Citation.]" (*Clark v. Burleigh, supra,* 4 Cal.4th 474, 483, fn. omitted.)

 As the United States Supreme Court has explained: "Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' [Citation.] In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. [Citation.] As we have stated on several occasions, ' " '[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " ' [Citations.]" (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. 37, 46.)

---

[7] [[This court has]] observed, "there are few examples of designated public forums in Supreme Court jurisprudence because the court has rarely . . . placed any property in this category." (*Clark v. Burleigh, supra,* 4 Cal.4th at p. 483.)

■ [[We have]] observed: "To apply the public forum doctrine a court proceeds in a series of steps. In step one the court defines the 'forum' by deciding whether the forum is the entire property to which access is sought or only a portion of that property. In step two the court decides whether the forum thus defined is a traditional 'public forum,' a 'designated public forum,' or a 'nonpublic forum.' If it is either of the first two kinds of forums, in step three the court decides whether the challenged law restricts the content of speech in that forum or only its time, place, or manner. And in step four the court tests the challenged law by the standard that governs both the class of forum it has selected in step two and, if relevant, the type of speech restriction it has identified in step three." (*Clark v. Burleigh, supra,* 4 Cal.4th 474, 484.)

Proceeding with step one, both sides agree that the forum is the internal school district mailboxes. As to step two, both sides agree that this forum is not a "traditional" public forum. They disagree, however, as to whether the forum is a "designated/limited public forum" or a "nonpublic forum." Relying on *Perry,* [[the District]] argue[[s]] that the mailboxes are a nonpublic forum.

The issue in *Perry* was whether it was constitutional for the school district to limit access to the school mailboxes to the union that represented district employees, thus denying access to a rival union that had previously been allowed to use the mailboxes. (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. 37, 39.) As the court stated: "The primary question presented is whether the First Amendment, applicable to the States by virtue of the Fourteenth Amendment, is violated when a union that has been elected by public school teachers as their exclusive bargaining representative is granted access to certain means of communication, while such access is denied to a rival union." (*Perry, supra,* at p. 44.) The high court disagreed with the rival union's position that "the school mail facilities have become a 'limited public forum' from which it may not be excluded because of the periodic use of the system by private non-school-connected groups, and [the union's] own unrestricted access to the system prior to [the rival union's] certification as exclusive representative." (*Id.* at p. 47.) The court concluded that teacher mailboxes in a school district's interschool mail system were not a public forum, and that the district could therefore validly prevent unions other than the teachers' exclusive bargaining representative from using the system. (*Id.* at p. 46.)

In the present case, the trial court found that the District's mailboxes are a forum "that has been opened to SLTA by statute, by the terms of the

collective bargaining agreement,[8] and by the conduct of the District. Thus as to this designated group, any restrictions by the District are subject to strict scrutiny." The trial court found that *Perry* did not apply, observing that the court in *Perry* itself had noted that "The very concept of the labor-management relationship requires that the representative union be free to express its independent view on matters within the scope of its representational duties." (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. 37, 51, fn. 10.) The court thus limited *Perry* to its holding that the school district was justified in excluding the rival union from using the mailboxes while allowing the representative union such access.

■ We first observe that " '[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.' [Citation.]" (*Hazelwood School District v. Kuhlmeier* [[(1988)]] 484 U.S. 260, 267 [[98 L.Ed.2d 592, 108 S.Ct. 562]].) In the present case, we do not believe that the Legislature or the District has created a designated public forum in the District's mailboxes. This is not a case where "by policy or by practice" the District has "opened its mail system for indiscriminate use by the general public," in which case one could "justifiably argue a public forum has been created." (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. 37, 47.) It is undisputed that the District only grants selective access to the mailboxes to outside interests. Moreover, the access granted by statute to SLTA is indistinguishable from the access accorded to the prevailing union in *Perry.*

■ [[SLTA]] reiterates the trial court's rationale that *Perry* involved the issue of access to the forum based on speaker identity, rather than the content of the speaker's message. However, the court in *Perry* specifically stated that "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on *the basis of subject matter* and speaker identity." (*Perry Ed. Assn. v. Perry Local Educators' Assn., supra,* 460 U.S. 37, 49, italics added.) [[This court]] relied, in part, on *Perry* in holding that it was constitutional for the Legislature to limit the statements of candidates for office that are placed in voter pamphlets to a brief factual statement of the candidate's own background and qualifications. (*Clark v. Burleigh, supra,* 4 Cal.4th 474, 494–495.) Thus, we read *Perry* to apply to restrictions based on content as well as speaker identity.

---

[8] The collective bargaining agreement provides, in part: "The Association shall have the right to post notices of Association business. The Association may use teacher mailboxes and communications for lawful communications to teachers. Such postings or items for school mailboxes must contain the date of posting or distribution and the identification of the Association."

[[Thus, under established First Amendment public forum doctrine, school mailboxes would be considered nonpublic forums. Although Government Code section 3543.1, subdivision (b) permits limited access by a recognized employee organization, as noted " '[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.' [Citation.]" (*Hazelwood School District v. Kuhlmeier, supra,* 484 U.S. at p. 267.) Here, Government Code section 3543.1 was not designed to open up school mailboxes to the general public and create a public forum, but to allow access by a single group with which the school's employees were affiliated. Therefore, the mailboxes are nonpublic forums and school districts would be able to impose viewpoint-neutral subject matter regulations on the content of what is placed in those mailboxes. (*Clark v. Burleigh, supra,* 4 Cal.4th 474, 483.) The prohibition of candidate endorsement literature is such a viewpoint-neutral regulation.]]

## 2. *Analysis Under the State Constitution*

The thrust of SLTA's position is that under the liberty of speech clause of the California Constitution (art. I, § 2, subd. (a)), a different analysis more protective of employee organizations' right of free expression is required—as explained below, either a balancing test or a "basic incompatibility" test. SLTA's starting point is the distinctive language of our constitutional provision: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).) It is often stated that the California liberty of speech clause is broader and more protective than the free speech clause of the First Amendment. (See, e.g., *Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 366–367 [93 Cal.Rptr.2d 1, 993 P.2d 334], and cases cited therein.) The liberty of speech clause has been interpreted more broadly than the First Amendment in several areas, including recognizing privately owned shopping centers as public forums subject to free speech protections (*Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 862–863 [69 Cal.Rptr.3d 288, 172 P.3d 742]) and according greater protection to certain types of commercial speech (*Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1, 16 [14 Cal.Rptr.3d 14, 90 P.3d 1179]).

SLTA first argues that California courts have not employed a public forum test when it comes to determining the free speech rights of teachers in the school setting, but instead have used a balancing test, citing *L. A. Teachers Union v. L. A. City Bd. of Ed.* (1969) 71 Cal.2d 551 [78 Cal.Rptr. 723, 455 P.2d 827] (*L. A. Teachers Union*) and *California Teachers Assn. v. Governing Board* (1996) 45 Cal.App.4th 1383 [53 Cal.Rptr.2d 474] (*CTA*). In *L. A. Teachers*

*Union,* the union contested the school district policy that prohibited off-duty teachers from circulating in the faculty lunchroom and lounge a petition for the improvement of education. The court, in explaining the proper test under the First Amendment, stated: "we must strike 'a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " (*L. A. Teachers Union, supra,* 71 Cal.2d at p. 558.) The court, in upholding the teachers' right to petition, concluded that the teachers' interest in political expression was paramount, while the district had failed to demonstrate that its concerns with substantial disruption of school operations were well founded. (*Id.* at pp. 559–563.)

In *CTA,* the question was whether teachers could wear buttons in school opposing a statewide school voucher initiative. Employing the balancing test used in *L. A. Teachers Union,* the court concluded that the District's strong interest in regulating classroom activity justified prohibiting teachers from wearing the buttons in the classroom, but that the balance tipped in favor of free expression in noninstructional settings. (*CTA, supra,* 45 Cal.App.4th at pp. 1388–1392.)

The District argues that we have never recognized and should not recognize a balancing test under the liberty of speech clause of the California Constitution that departs from public forum analysis under the First Amendment. It points out that *L. A. Teachers Union* predates development of the public forum doctrine. Although SLTA cites *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353] in arguing that this court had already adopted something like a public forum analysis by the time *L. A. Teachers Union* had been decided, it appears correct that not until *Perry* in 1983 did the United States Supreme Court articulate its three-tiered public forum doctrine. (See Farber & Nowak, *The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication* (1984) 70 Va. L.Rev. 1219, 1220–1221 (Farber & Nowak).) Moreover, *L. A. Teachers Union* cannot plausibly be read to signify that this court considered and rejected public forum doctrine in analyzing employee speech in schools under the California Constitution—indeed the case was decided under the First Amendment. (*L. A. Teachers Union, supra,* 71 Cal.2d at p. 566.)

In any event, the present case is also distinguishable from *L. A. Teachers Union.* In the latter case, there was no question that the faculty lounge and lunchroom were places in which unrestricted conversations between teachers took place, and we found no plausible reason to prevent the circulation of a petition in that context. (*L. A. Teachers Union, supra,* 71 Cal.2d at pp. 560–563.) We rejected the notion that the government had an interest in

preventing controversy, or that its interest in preventing disruption of off-duty faculty engaged in work-related preparation justified a broad prohibition on circulating petitions. (*Id.* at pp. 561–562.) In the present case, the school mailboxes are dedicated to school business and, by statute, to union communications with employees, but are not places where open exchanges of ideas occur. The District has a legitimate interest in restricting mailbox communications so as not to permit such mailboxes to become venues for the one-sided endorsement of political candidates by those with special access.

SLTA and amicus curiae American Civil Liberties Union also advocate an alternative type of public forum analysis principally based on *U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157 [201 Cal.Rptr. 837] (*U.C. Weapons Labs*). In that case, a group protesting nuclear weapons research at the University of California's Lawrence Livermore Laboratory (Livermore Laboratory) sought a preliminary injunction to compel access to the laboratory's visitor centers, for purposes of distributing and displaying its literature to the public and to the auditorium for purposes of showing a slideshow or film. The court departed somewhat from the United States Supreme Court's rendering of the public forum doctrine, and instead articulated a more protective version based on the liberty of speech clause of the California Constitution. (154 Cal.App.3d at p. 1169.) The court rejected an all-or-nothing approach to the issue of whether government property is a public forum, viewing the public forum question as "a continuum, with public streets and parks at one end and government institutions like hospitals and prisons at the other." (*Id.* at p. 1164.)

Instead, adopting the analysis formulated by then Court of Appeal Justice Grodin in *Prisoners Union v. Department of Corrections* (1982) 135 Cal.App.3d 930, 935 [185 Cal.Rptr. 634], the court reasoned that the question was not whether the government property in question could be considered a public forum, but rather whether there was a "basic incompatibility" between the proposed communicative activity and the intended use of the government property. (*U.C. Weapons Labs, supra,* 154 Cal.App.3d at p. 1164; see *Prisoners Union v. Department of Corrections, supra,* 135 Cal.App.3d at p. 935.) The court decided there was no basic incompatibility between the visitors center's functioning as a venue for disseminating information to the public, and the display and distribution of literature protesting Livermore Laboratory's nuclear weapons research. (*U.C. Weapons Labs,* at pp. 1168–1169.) On the other hand, the court denied that portion of the preliminary injunction that sought access to Livermore Laboratory's auditorium, which was used primarily for technical group meetings and could not be classified even as a "semi-public forum." (*Id.* at p. 1170.)

SLTA, joined by its amici curiae, argues that under the basic incompatibility test, its position should prevail. They further point to a number of academic articles critical of the United States Supreme Court's public forum doctrine as lacking intellectual coherence and being insufficiently protective of free speech. (See Farber & Nowak, *supra*, 70 Va. L.Rev. at p. 1219; Massey, *Public Fora, Neutral Governments, and the Prism of Property* (1999) 50 Hastings L.J. 309.) On the other hand, as the Court of Appeal pointed out below, this basic incompatibility test has not been found in California appellate cases since *U.C. Weapons Labs*. The court also pointed out that the concept of "basic incompatibility" is used in First Amendment analysis after it has been decided that the government property in question is a public forum, to determine whether a given regulation constitutes a reasonable time, place or manner restriction. (See *Grayned v. City of Rockford* (1972) 408 U.S. 104, 116 [33 L.Ed.2d 222, 92 S.Ct. 2294].)

In any event, *U.C. Weapons Labs* is distinguishable from the present case. In the former case, the primary purpose of the visitors center was the dissemination of information about the laboratory and its work. (*U.C. Weapons Labs, supra*, 154 Cal.App.3d at p. 1168.) The court determined that the government had no legitimate interest in monopolizing the dissemination of information about the laboratory on that site. (*Id.* at pp. 1168–1169.) In the present case, the District is not attempting to monopolize speech regarding political endorsements in mailboxes, but rather has determined, pursuant to statutory directive, to disallow use of mailboxes for one-sided political endorsements. As discussed in the previous section of this opinion, this prohibition on the use of government resources for political campaigning is a means of promoting an important government interest, i.e., maintaining the integrity of the electoral process by neutralizing any advantage that those with special access to government resources might possess. (See *Stanson, supra*, 17 Cal.3d at pp. 217–218; *Vargas v. City of Salinas, supra*, 46 Cal.4th at pp. 23–24.)

Again, we emphasize the narrow reach of our holding. Political speech is " 'at the core of what the First Amendment is designed to protect.' " (*Morse v. Frederick* (2007) 551 U.S. 393 [168 L.Ed.2d 290, 127 S.Ct. 2618, 2626].) Neither the First Amendment nor the free speech clause of the California Constitution, nor, as discussed, California statutory law, countenances undue restriction on the political speech of teachers or their unions. But we hold the District may constitutionally determine pursuant to section 7054 that internal school mailboxes should be kept free of literature containing endorsements of political candidates.

## III. Disposition

The SLTA sought a writ of mandate to compel the District to reverse its policy against candidate endorsement literature in school mailboxes. Because we determine the District's policy is lawful, we affirm the judgment of the Court of Appeal reversing the trial court's granting of SLTA's writ petition.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.