Filed 6/20/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PARK MANAGEMENT CORP., <br>     Plaintiff and Respondent, <br> v. <br> IN DEFENSE OF ANIMALS et al., <br>     Defendants; <br> JOSEPH CUVIELLO, <br>     Intervener and Appellant. | A148425 <br><br> (Solano County <br> Super. Ct. No. FCS043477) |

Animal rights activist Joseph Cuviello appeals the entry of a permanent injunction in this trespass action prohibiting him from demonstrating outside of Six Flags Discovery Kingdom, a privately owned amusement park located in Vallejo, California. Ruling on cross-motions for summary judgment, the superior court rejected Cuviello's federal and state constitutional claims that he had a right to picket there peacefully, as well as a common law defense based on a claimed prescriptive easement, and it entered judgment accordingly.

Cuviello appeals, raising both constitutional and non-constitutional issues. In the unpublished portion of this opinion, we conclude Cuviello failed to prove as a matter of law that he has acquired a common law prescriptive right to protest there. In the published portion, we hold as a matter of first impression that the exterior, unticketed areas of the amusement park are a public forum for expressive activity under article I, section 2 of the California Constitution, and accordingly we reverse the judgment.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion part I.

1

# BACKGROUND

Respondent Park Management Corp. (Park Management) owns and operates Six Flags Discovery Kingdom, an amusement park in Vallejo, California that features rides as well as animal attractions. Its attendance can reach more than 15,000 patrons daily.

Situated on 138 acres, the amusement park consists of a ticketed interior portion where the entertainment activities are located, accessible through a single point of entry and exit, and an exterior portion where there is an admissions area connected by a series of walkways and streets to a paid parking lot that accommodates up to 2,900 cars, with tram service for transporting guests to the admissions area.[1] The exterior admissions area contains ticket windows and thirteen turnstiles, and is approximately 200 feet wide and 150 feet deep. Adjacent to the parking lot's gated entrance is a public sidewalk that runs along Fairgrounds Drive, a street bordering the park's eastern boundary.

The exterior areas of the park (i.e., those outside the ticketed area), including the front admissions area, the parking lot and the walkways that connect them, do not have any areas where guests may gather and stay for any period of time other than for the purpose of waiting for, or meeting, friends or family going into the amusement park. Those areas do not offer outdoor performances or other entertainment activities. In addition, it is undisputed that the front entrance area does not include any common areas for guests to congregate for the purpose of entertainment, but merely facilitates the guests' entrance to and exit from the park.

The amusement park is situated on land that, according to local law and land use planning instruments, bears some public attributes. The City of Vallejo's General Plan designates the land as a "Community Park" (or, alternatively, as "Open Space— Community Park"); that designation is defined as including "public and other types of developed recreation areas, state and county parks, and buffer areas. Typical uses include golf courses and neighborhood parks." (Italics omitted.) And under the City of Vallejo's

---

[1] There also is overflow, off-site parking lot at a nearby, county-owned fairground.

zoning code, the property falls within the city's "public and quasi-public facilities zoning district," an area that is defined as one in which "community facilities of a public nature are the principal use" and that is intended to "implement those policies of the land use element of the Vallejo general plan which relate to governmental, and quasi-governmental services, schools, parks and open space areas."

For many years (since at least the 1990s), the amusement park was municipally owned but privately operated. Operating at the time under the name "Marine World" (or "Six Flags Marine World"), the theme park was located on property owned by the City of Vallejo which, through a series of agreements with other governmental agencies,[2] leased a portion of the property to Park Management which operated the theme park pursuant to a separate management agreement. Park Management received a management fee and paid the city only nominal rent ($1/year) and 20 percent of net revenues. It also had an exclusive option to purchase the entire property, including the theme park assets.

In May 2006, a federal district court entered a preliminary injunction, over the opposition of Park Management but unopposed by the City of Vallejo, recognizing the constitutional right of an individual named Alfredo Kuba to protest with up to ten other people at the park's front entrance, located on the public portion of the property. Kuba had twice been arrested there, and wanted to protest there during the upcoming, heavily attended Memorial Day weekend. Deciding the question solely under state law, the district court ruled that the areas around the park's entrance are public fora under California's free speech clause, and that the park's public assembly policy (which barred

---

[2] One was the city's redevelopment agency, the Redevelopment Agency of the City of Vallejo. The other was the Marine World Joint Powers Authority which, as described by a preliminary injunction entered in a prior federal case, was a public agency created by agreement between the City of Vallejo and the Redevelopment Agency of the City of Vallejo, whose purpose was to accept conveyance of the assets, assume the liabilities and protect the City of Vallejo's interest related to Marine World.

3

the activity) was not a reasonable time, place or manner restriction and was therefore unconstitutional.[3]

The following year, Park Management exercised its purchase option and, in July 2007, acquired the park from the city for approximately $53.9 million. It has owned and operated the entire park ever since.

Although the parties do not focus on many details of the 2007 acquisition, the record reflects continuing local governmental involvement in the park notwithstanding the transfer of title.[4] As part of the acquisition, the City of Vallejo entered into a 25-year development agreement with Park Management in which the city contractually committed to retain the park's zoning designation as "public and quasi-public facilities." In return, Park Management agreed to pay the city a percentage of annual admissions revenue, an income stream their agreement characterizes as a "park operation fee" and treats as separate from (and therefore in addition to) municipal taxes, assessments and fees.[5] The operation fee is intended to guarantee the city at least 45 percent of Park Management's gross revenues.[6] In addition, in a separate agreement (entitled, Owner

---

[3] The record does not reflect the disposition of the Kuba case.

[4] The record contains a copy (without exhibits) of an amended option agreement dated April 21, 2005, which Park Management represents in its brief "sets forth the general terms of the sale", and portions of the city's July 31, 2017 development agreement with Park Management. In his reply papers, Cuviello also introduced without objection a complete copy of the sales agreement itself, a prodigious document consisting of 28 separate transfer and collateral documents.

[5] It is unclear from the record whether, or to what extent, the City of Vallejo's economic stake in the park diminished to any significant degree when the park was transferred to private ownership. The parties did not brief that question, and their relative economic positions are difficult to discern based solely on the complex legal and financing structures governing their relationship, both before and after the transfer.

[6] The operation fee was structured as 2.5 percent of annual admissions revenue, but the parties contemplated that the amount of the fee would fluctuate annually based on a number of factors, agreed that it shouldn't be adversely impacted by ticket pricing strategies, and agreed to amend the development agreement if necessary if the fee fell below 45 percent of gross revenues.

4

Participation and Cooperation Agreement), the city's redevelopment agency agreed to contribute up to $7 million dollars to finance the construction of a new 2,450-spot parking structure on publicly owned, county fairgrounds that would be leased to Park Management. The latter agreement recited that the redevelopment agency wanted the improvements made "for the public benefit," in conjunction with renovations to the park property itself. The public funding was expressly conditioned, though, on Park Management's commitment to operate the amusement park for 10 years, a commitment they agreed would run with the land.[7]

After the 2007 acquisition, Park Management began limiting free speech at the park in increasingly restrictive ways. Several months after the acquisition, in the fall of 2007, it revised the amusement park's free speech policy to relegate expressive activity to specified locations.[8] Then in 2014, approximately seven years after the park had transferred to private ownership, Park Management again revised its free speech policy in response to a recent, unpublished trial court ruling that another theme park, Sea World in San Diego, was not constitutionally required to allow protests or demonstrations in its own parking lot or entrance area. Park Management's new (and final) policy banned all expressive activity at Six Flags Discovery Kingdom, including protests, relegating such activity instead to the nearby public sidewalk.[9]

On April 13, 2014, about a month after the new speech ban took effect, approximately eight people protested against the park's treatment of animals at the park's

---

[7] Their agreement disclaimed the existence of a joint venture or partnership.

[8] The record does not specify the locations.

[9] Those current regulations state: "The entrance ways, driving and walking paths, parking lots, entrance and admission areas, restaurants, animal viewing areas, and the amusement and animal park as a whole, are all on private property. These areas are not open to the public for purposes of congregation, assembly, and/or protest, and are not public or quasi-public forums. As such, *no protests or similar expressive activities, whether orally or in writing (signs, handbills, leaflets, papers, etc.) are allowed on the private property. Any protests or similar expressive activity, if conducted, must be done from the public sidewalks, in front of Discovery Kingdom, as designated on the attached Map.*" (Italics added.)

5

front entrance area, and a ninth person handed out leaflets in the parking lot. They wore large signs around their necks carrying messages such as, "Theme Parks are no place for animals"; "RIP" (with a picture of an elephant); "A day of fun for you . . . a lifetime of misery for him" (with a photograph of a whale in a tank); "Animals Don't Belong at Six Flags"; and "This pool is a prison" (with another photograph of a whale in a tank). The protesters also held a large yellow banner that stated, "NOT FUN FOR ANIMALS." Security personnel approached them, handed out copies of the park's speech regulations and asked the protesters to move to the public sidewalk, but the protesters declined and remained at the front gate for three hours without the park's consent or authorization. Park Management contacted the local police department and the local district attorney's office, both of which declined to intervene without a court order.[10]

One of the protesters was Joseph Cuviello, who had been advocating for the humane treatment of animals for decades, including at many public venues in California. Since the early 1990's, Cuviello had participated in many demonstrations at the front entrance area of Six Flags Discovery Kingdom, including numerous times in the seven years the park had been under private ownership. He couldn't recall the exact number, but in some years he had attended more than four demonstrations annually.[11] After the park became privately owned, park employees "periodically" would tell Cuviello to move to a different location on the property or offsite, but he never did. He was never accused of interfering with normal business operations, either by park personnel or the police. Although the park received complaints from some patrons who didn't appreciate the protesters' message, it is undisputed the demonstrations he took part in at the front

---

[10] The park also deactivated the season passes of two of the protesters who had caused a disruption during an animal performance the previous month. Those two individuals are not parties to this appeal, and their prior conduct inside the park is not at issue.

[11] His recollection was consistent with that of a park employee who testified in deposition that demonstrations occurred there about four to six times every year, including after the park had transferred to private ownership.

entrance were always peaceful and caused no disruptions. The parties also stipulated that the protest activities caused no quantifiable decrease in park attendance.[12]

After the April 2014 protest, Park Management filed this case in superior court against several animal advocacy groups and their members, alleging a single cause of action for private trespass. It sought injunctive relief prohibiting the defendants from protesting anywhere on the property, including the park's parking lots, driving and walking paths, and entrance and admission areas. After the court entered a temporary restraining order, Cuviello intervened as an unnamed Doe defendant, alleging he had been demonstrating against the treatment of animals at the park property for over 20 years. He asserted both a federal and constitutional right to protest there.

Park Management moved for summary judgment, arguing Cuviello should be restrained from protesting on the park's driving and walking paths, parking lots and entrance and admission areas. It raised two issues: it contended, first, the park is not a quasi-public forum for purposes of expressive activity under California's constitution, and second, that it had not waived its right to enforce its rules regarding expressive activity simply because Cuviello had protested there in the past. In opposition, Cuviello argued he had a First Amendment right to protest there because the park had been dedicated to a public use, both because of its zoning status (public and quasi-public use) and because the city had designated it as a community park. He also raised two state law issues: he argued the park was a public forum under state constitutional law, and also that, given the frequency of his past activities there, he had acquired a common law prescriptive easement right to protest there.

Cuviello also filed a cross-motion for summary judgment asserting these federal and state constitutional claims as a complete defense to the trespass claim. His cross-motion for summary judgment did not raise the prescriptive easement defense.

---

[12] The trial court memorialized their agreement in a December 28, 2015 discovery ruling, in what the court described as an "issue preclusion."

The trial court denied Cuviello's cross-motion and granted summary judgment for Park Management. It ruled that the First Amendment does not apply to private property and that the property was not a public forum for expressive activity under California's constitution, and it rejected Cuviello's prescriptive easement claim. The court entered a permanent injunction barring Cuviello from protesting or picketing "on the privately owned premises of Plaintiff, namely, Six Flags Discovery Kingdom's driving and walking paths, parking lots, and entrance and admission areas." This appeal followed.

**DISCUSSION**

On appeal, Cuviello reprises the legal arguments he made below. Principally, he argues that his protest activities are constitutionally protected, because the exterior areas of the amusement park are a public forum for free speech under both the First Amendment and article 1, section 2 of California's constitution. He also contends he has a prescriptive right to protest on-site at Six Flags Discovery Kingdom because he met all of the legal requirements for obtaining a prescriptive easement.

We review the trial court's summary judgment rulings de novo. " 'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion. [Citation.] [¶] Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' " (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)

"A plaintiff . . . has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on the cause of action. Once the plaintiff . . . has met that burden, the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c,

8

subd. (p)(1).)  By contrast, a defendant moving for summary judgment based on an affirmative defense " 'bears an overall burden of persuasion that there is a complete defense to the plaintiff's action' . . . [and] must persuade the court there is no triable issue of fact as to that defense." (*Fazio v. Fairbanks Ranch Country Club* (2015) 233 Cal.App.4th 1053, 1057.)

On appeal, "[w]e apply the same three-step analysis required of the trial court. ' " 'First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond. . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' " ' " (*Hamburg v. Wal-Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 503.)

## I.

### *Prescriptive Easement*

Although the parties' briefing leads with the constitutional questions, we start first with the prescriptive easement issue because we must " 'avoid resolving constitutional questions if the issue may be resolved on narrower grounds.' " (*Hassell v. Bird* (2018) 5 Cal.5th 522, 534.)  Cuviello maintains that, on the undisputed facts, he established all of the elements necessary to establish a prescriptive right to protest at the park "on those occasions when he needs to."  He does not argue that this defense presents any triable issues of fact (nor, for that matter, does Park Management).

Cuviello's failure to move for summary judgment on this issue does not preclude us from considering whether he is entitled to a judgment in his favor on this ground as a matter of law.[13]  Nevertheless, we conclude he has not met his burden of demonstrating that he is.

---

[13] Although Cuviello raised the prescriptive easement defense merely in opposition to Park Management's summary judgment, and not in his own cross-motion

9

"The elements necessary to establish a prescriptive easement are well settled. The party claiming such an easement must show use of the property which has been open, notorious, continuous and adverse for an uninterrupted period of five years." (*Warsaw v. Chicago Metallic Ceilings, Inc*. (1984) 35 Cal.3d 564, 570 (*Warsaw*).) It is unnecessary to examine each element, because Cuviello has not shown as a matter of law he satisfied the "continuous use" requirement.

We agree with Cuviello that this element does not require a party to show that he has used the property constantly over the prescriptive period without interruption, but only that the adverse use occurred whenever "necessary" or "needed." (See *Fogerty v. State of California* (1986) 187 Cal.App.3d 224, 239; *Twin Peaks Land Co. v. Briggs* (1982) 130 Cal.App.3d 587, 593; see also *Scott v. Henry* (1925) 196 Cal. 666, 670 [running water through irrigation ditch "at will and without interruption" during the prescriptive period "whenever and as often as irrigation was necessary" is sufficient]; *Northern California Power Co., Consolidated v. Flood* (1921) 186 Cal. 301, 306 [diverting water from stream for irrigation purposes "at the time when it is necessary do so" satisfies continuous use requirement even though "there may be many days or weeks during which he does not use it at all"].) Still, though, the existence of a prescriptive easement ordinarily is a question of fact. (See, e.g., *Warsaw*, *supra*, 35 Cal.3d at p. 570; *Aaron v. Durham* (2006) 137 Cal.App.4th 1244, 1250.) Cuviello introduced no evidence below addressing why a small handful of demonstrations annually met the continuous use requirement. His evidence did not address how frequently he *needed* to demonstrate there in order to carry out his goal of effectively advocating for an end to the inhumane treatment of animals, but only how frequently *he did so* (four to six times a year). To be

---

for summary judgment, we may direct the trial court to enter judgment "[w]here it appears from the record as a matter of law there is only one proper judgment on undisputed facts." (*Conley v. Matthes* (1997) 56 Cal.App.4th 1453, 1459, fn. 7 [party appealing from summary judgment entered against it held entitled to judgment in its favor despite not having moved for summary judgment in trial court]; Code Civ. Proc., § 43.)

sure, the question of need in this context may well be subjective, but even if so it was still his burden to address it (i.e., by introducing evidence on the subject). Cuviello cites no authority establishing that, as a matter of law, intermittent use during the prescriptive period satisfies the "continuous use" requirement.[14] Nor does he even, more generally, cite any authority recognizing the existence of a prescriptive easement as a matter of law on summary judgment.

Particularly in the context of this type of use, we are not persuaded that six times a year is sufficient as a matter of law without some explanation for the frequency of the demonstrations. Indeed, given the size of this park and the sheer number of people it attracts, who is to say that 100 times a year would be enough to effectively convey Cuviello's message? Conversely, what about once a year? Without any evidence illuminating the reasons Cuviello chose to protest there as infrequently as he did in order to advance his message (and not more frequently), we cannot say he satisfied the continuous use requirement as a matter of law. Accordingly, he has failed to demonstrate that he was entitled to a judgment in his favor that he acquired a prescriptive right to protest there on the basis of the undisputed facts presented in the trial court.

---

[14] The sole exception is *Fogerty v. State of California*, *supra*, 187 Cal.App.3d at p. 239, a water rights case that is inapposite. *Fogerty*, which involved the issue of determining which portion of land along the shore of Lake Tahoe is subject to the public trust doctrine, analogized to the doctrine of prescriptive rights, and in that context announced the principle that water stored in a reservoir behind a dam does not need to "remain in place continuously for the five-year period in order for prescriptive rights to attach," because "[p]ractical experience tells us no reservoir operates that way" and so "the needs of the reservoir operator are determinative." (*Fogerty*, at p. 239.) Thus, it reasoned, "[w]here [a] reservoir operator returns the waters to a zenith each water year and maintains the water at that elevation for the duration of his needs his use of the reservoir is 'continuous' up to and including that highest point." (*Ibid*.) Extending that principle to the public trust doctrine, *Fogerty* established the high-water mark of Lake Tahoe as a matter of law on appeal, based on undisputed facts concerning the highest elevation the lake had reached in five sequential years. (See *id.* at pp. 239–240.) *Fogerty* sheds no light on whether a protestor may gain prescriptive rights to demonstrate on private property by doing so several times a year over a five-year period.

***Under California's Constitution, the Amusement Park's Unticketed, Exterior Areas Are a Public Forum for Expressive Activity.***

Article I, section 2 of the California Constitution protects the right of every individual to "freely speak, write and publish his or her sentiments on all subjects" (subject to "being responsible for the abuse of this right") and provides that "[a] law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, §2, subd. (a).) It is by now well-settled that this free speech guarantee sometimes extends to speech on private property. Exactly how far it extends, however, is not.

The California Supreme Court has not articulated a precise standard to judge whether private property constitutes a public forum for free speech purposes under California's constitution, but it has said, at the highest level of generality, private property constitutes a public forum if the property is open to the public "in the same manner as public streets or parks." (*Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 859 (*Fashion Valley Mall*).) So, for example, our Supreme Court in its seminal *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899 (*Pruneyard*) decision held to be a public forum the common area of a private shopping mall. Prior to that it had also held to be public fora: a privately owned railway terminal (*In re Hoffman* (1967) 67 Cal.2d 845 (*Hoffman*) [citing federal law]) and a privately owned sidewalk outside a business *not* located within a shopping center (*In re Lane* (1969) 71 Cal.2d 872), applying federal law.[15] By contrast, in its most recent decision addressing the scope of free speech rights on private property, *Ralphs Grocery*, *supra*, 55 Cal.4th 1083, our Supreme Court held that the *entrance* to an *individual store* within a

---

[15] *In re Lane* rested in part on federal law that has been abrogated but it remains useful precedent for purposes of interpreting our state Constitution. (See *Pruneyard*, *supra*, 23 Cal.3d at p. 908; see also *Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8* (2013) 55 Cal.4th 1083, 1098 (*Ralphs Grocery*) ["the free speech guarantee of the federal Constitution's First Amendment, as currently construed by the nation's high court, does not extend to speech activities on privately owned sidewalks in front of the entrances to stores"].)

privately owned shopping center is not a public forum under article 1, section 2. It held that "to be a public forum under our state Constitution's liberty-of-speech provision, *an area within a shopping center* must be designed and furnished in a way that induces shoppers to congregate there for purposes of entertainment, relaxation, or conversation, and not merely to walk to or from a parking area, or to walk from one store to another, or to view a store's merchandise and advertising displays." (*Ralphs Grocery*, at p. 1093, italics added; see also *id*. at p. 1092 [stating the legal standard that applies "within a shopping center or mall"].)[16] The Supreme Court stated its holding in *Ralphs Grocery* narrowly, however, and it has yet to clarify how far *Ralphs Grocery* applies in other contexts.[17]

We also are mindful that private shopping malls, although they have featured prominently in free speech jurisprudence (both state and federal), do not represent the outer limits of private property that may be subject to article 1, section 2's liberty of speech clause. As our Supreme Court previously explained, "The idea that private property can constitute a public forum for free speech if it is open to the public in a manner similar to that of public streets and sidewalks long predates [the Court's] decision in *Pruneyard*." (*Fashion Valley Mall*, *supra*, 42 Cal.4th at pp. 858.) *Fashion Valley Mall* explained: "The United States Supreme Court recognized more than a half-century

---

[16] A plurality of the court also has concluded that article I, section 2 contains a state action requirement, which is satisfied by the actions of a private property owner "only if the property is freely and openly accessible to the public." (*Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1033 (plur. opn. of Brown, J.).) No question has been raised in this case concerning the requirement of state action.

[17] Only two published California decisions have construed and applied *Ralphs Grocery* and, like both *Ralphs Grocery* and *Pruneyard*, they involve privately owned retail stores. (See *Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245, 257–261 [sidewalk areas in front of grocery stores held not a public forum]; *Donahue Schriber Realty Group, Inc. v. Nu Creation Outreach* (2014) 232 Cal.App.4th 1171, 1174, 1183–1184, 1186 [sidewalks adjacent to entrances of individual stores located within privately owned shopping center held not a public forum].)

13

ago that the right to free speech guaranteed by the First Amendment to the United States Constitution can apply even on privately owned land. In *Marsh v. Alabama* (1946) 326 U.S. 501, 502, the high court held that a Jehovah's Witness had the right to distribute religious literature on the sidewalk near the post office of a town owned by the Gulf Shipbuilding Corporation, because the town had 'all the characteristics of any other American town. . . . In short, the town and its shopping district are accessible to and freely used by the public in general, and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation.' (*Id*. at pp. 502–503.) The high court stated: 'The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.' (*Id*. at p. 506.)" (*Id*. at pp. 858–859.)

Another authority the Supreme Court discussed in *Fashion Valley Mall* was *Hoffman*, *supra*, 67 Cal.2d 845. As construed by *Fashion Valley Mall*, the California Supreme Court in *Hoffman* "reiterated that private property that was open to the public in the same manner as public streets or parks could constitute a public forum for free expression, holding that protesters had the right to express their opposition to the war in Vietnam by distributing leaflets in Union Station in Los Angeles, 'a spacious area open to the community as a center for rail transportation' that was owned by three railroad companies. ([*Hoffman*,] at p. 847.) The court reasoned that, with regard to distributing leaflets, 'a railway station is like a public street or park. Noise and commotion are characteristic of the normal operation of a railway station. The railroads seek neither privacy within nor exclusive possession of their station. They therefore cannot invoke the law of trespass against petitioners to protect those interests. [¶] Nor was there any other interest that would justify prohibiting petitioners' activities. Those activities in no way interfered with the use of the station. They did not impede the movement of passengers or trains, distract or interfere with the railroad employees' conduct of their business, block access to ticket windows, transportation facilities or other business legitimately on the premises. Petitioners were not noisy, they created no disturbance, and

14

did not harass patrons who did not wish to hear what they had to say. [¶] Had petitioners in any way interfered with the conduct of the railroad business, they could legitimately have been asked to leave.' (*Id*. at pp. 851–852, fn. omitted)." (*Fashion Valley Mall*, *supra*, 42 Cal.4th at p. 859.)

This is a difficult, close case, in part because the California Supreme Court's decisions in this area are hard to synthesize.

On the one hand, Six Flags is zoned by local law in a manner similar to that of a park, which is a quintessential type of public forum (see *Hoffman*, *supra*, 67 Cal.2d at p. 849) even if privately owned.[18] (See *Hague v. Committee for Indus. Organization* (1939) 307 U.S. 496, 515 ["*Wherever the title of streets and parks may rest*, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," italics added]; see also *Evans v. Newton* (1966) 382 U.S. 296, 301–302 [municipally owned park transferred to private ownership retained its public character under Fourteenth Amendment; even a private park is "like a fire department or police department that traditionally serves the community. Mass recreation through the use of parks is plainly in the public domain"]; *In re Cox* (1970) 3 Cal.3d 205, 218, fn. 16 [describing *Evans* as involving a "privately owned city park generally open to the public"].) To be sure, Six Flags Discovery Kingdom is not a park in the typical, Frederick Law Olmsted sense: there is no indication in the record it contains any open spaces, freely accessible to the public for recreation and relaxation. Yet its designation as such sheds light on its public character. As *Pruneyard* explained, state constitutional rights of free expression are part and parcel of the state's more general

---

[18] "Article I's free speech clause is at least as broad as the First Amendment's, and its right to freedom of speech is at least as great." (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 490; accord, *Pruneyard*, *supra*, 23 Cal.3d at p. 908 [state constitutional free speech guarantee is " 'more definitive and inclusive' " than federal counterpart].) Accordingly, First Amendment case law, while not controlling, is entitled to "respectful consideration" for its persuasive value. (*Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 341.)

power to regulate the use of private property. (See *Pruneyard*, *supra*, 23 Cal.3d at pp. 905–908; see also *Schwartz-Torrance Inv. Corp. v. Bakery and Confectionary Workers' Union, Local No. 31* (1964) 61 Cal.2d 766, 771 [noting "the diluted nature of a [private] property right in premises opened to the public"].)  Among other things, *Pruneyard* explained, "[p]roperty rights must yield to the public interest served by zoning laws . . . and to many other public concerns." (*Pruneyard*, at p. 906.)  And it proceeded to the constitutional question in that case only because "[n]o California statute prescribes that shopping center owners provide public forums." (*Id*. at p. 908.)  Here, by contrast, there is a relevant local law bearing on the public character of this property (i.e., its zoning status) and *Pruneyard*'s implication is that we are not free to disregard it.

In terms of sheer size, moreover, Six Flags Discovery Kingdom, at 138 acres, is more than six times larger than the *Pruneyard* shopping center (see *Pruneyard*, *supra*, 23 Cal.3d at p. 902 [21 acres]), and its front entrance area alone—which measures half the size of  a football field in depth (150 feet) and 2/3 the size in width (200 feet)—is considerably larger than the space considered in *Ralphs Grocery* (see *Ralphs Grocery*, *supra*, at p. 1089 [15-foot wide walkway]).  This is not a "modest" establishment. (See *Pruneyard*, at p. 910.)  And in decisions pre-dating *Ralphs Grocery*, the Ninth Circuit has held comparable types of venues to be public fora under California law. (See *Carreras v. City of Anaheim* (9th Cir. 1985) 768 F.2d 1039, 1043–1045 & fn. 11 [parking areas and pedestrian walkways outside of publicly owned stadium and convention center, including on game days when private athletic teams have right to exclusive possession], abrogated on other grounds, *Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352; *Kuba v. 1-A Agricultural Assn.* (9th Cir. 2004) 387 F.3d 850, 856–857 [parking lots and pedestrian walkways outside of state-owned exhibition facility utilized by circuses and other private event promoters].)

Other facts, on the other hand, weigh against a conclusion that Six Flags Discovery Kingdom is a public forum.  Most notably, its exterior portions are not designed and furnished in a manner that encourages people to linger, other than as

16

necessary to purchase tickets and wait for family or friends.[19]  (See *Ralphs Grocery*, *supra*, 55 Cal.4th at p. 1093.)  And unlike a shopping center (*Pruneyard*), a company town (*Marsh v. Alabama* (1946) 326 U.S. 501), or even arguably a railway terminal (*Hoffman*, *supra*, 67 Cal.2d 845), an amusement park is not the functional equivalent of an entire town.

Given that the California Supreme Court has not charted a clear path, we turn to guidance from appellate court decisions in order to resolve this case, although we have found none that are closely on point.

Before the Supreme Court's most recent decision in *Ralphs Grocery*, this court had construed *Pruneyard* as establishing a balancing test to determine whether private property constitutes a public forum (*Trader Joe's Co. v. Progressive Campaigns, Inc.* (1999) 73 Cal.App.4th 425, 433 (*Trader Joe's*)) and other appellate courts agreed, including in two decisions *Ralphs Grocery* cited with approval (see *Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th 106, 119 (*Albertson's*); *Van v. Target Corp.* (2007) 155 Cal.App.4th 1375, 1383–1384 (*Van*); *Ralphs Grocery*, *supra*, 55 Cal.4th at pp. 1092–1093 [discussing and *Albertson's* and *Van*]).

We quote at some length our analysis of *Pruneyard* in *Trader Joe's*:  "[T]he *Pruneyard* court was careful to not ' "minimize the importance of the constitutional guarantees attaching to private ownership of property." ' (*Pruneyard*, *supra*, 23 Cal.3d at p. 906.)  The court noted, though, that the property owner's interests were not materially injured by the challenged activity in light of the fact that the owner had ' " 'fully opened his property to the public.' " ' (*Id*. at p. 910.)  Further, the court recognized that ' " [a]ll private property is held subject to the power of the government to regulate its use for the public welfare." [Citations.]' (*Id*. at p. 906.)  Here, affording strong protection to free

---

[19]  According to the uncontroverted declaration of an urban planning expert proffered by Park Management, the exterior areas have no places where park patrons may gather and stay for any period of time other than for the purpose of waiting for, or meeting, friends or family going into the amusement park, and have no performance or other entertainment activities.

17

speech and petitioning rights would serve the public welfare. The court reasoned that '[t]o protect free speech and petitioning is a goal that surely matches the protecting of health and safety, the environment, aesthetics, property values and other societal goals that have been held to justify reasonable restrictions on private property rights.' (*Id*. at p. 908.) The court also recognized that the government's power to regulate property when the interests of the individual owner come in conflict with the interests of society is not static; property rights can and should be redefined to accommodate the conditions of modern life. (*Id*. at pp. 906–907.) The specific 'condition of modern life' that grabbed the *Pruneyard* court's attention was the evolution of the suburban shopping mall and its particular suitability as a forum for expressive activity. [¶] The *Pruneyard* court supported its holding with evidence in the record before it illustrating that suburban shopping centers were replacing central business districts as the favored forum for public congregation. . . . [¶] . . . [¶] Balancing the interest of the shopping center owner, in maintaining exclusive control over property he has opened to the public, against the societal interest, in utilizing the shopping mall as a public forum for expressive activity, the *Pruneyard* court concluded that the societal interest should prevail." (*Trader Joe's*, *supra*, 73 Cal.App.4th at pp. 431–432.)

In *Trader Joe's* we thus concluded, "*Pruneyard* instructs us to balance the competing interests of the property owner and of the society with respect to the particular property or type of property at issue to determine whether there is a state constitutional right to engage in the challenged activity." (*Trader Joe's*, *supra*, 73 Cal.App.4th at p. 433.) As later courts have put it, the focus is on "whether private property serves as the functional equivalent of a public forum." (*Van*, *supra*, 155 Cal.App.4th at p. 1383.) And in making that assessment, courts consider several factors including " 'the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants.' " (*Id*. at p. 1384.)

*Ralphs Grocery* neither endorsed nor rejected our understanding of *Pruneyard* as requiring a balancing test. However, nothing in the reasoning of *Ralphs Grocery*

undermines that interpretation, and one appellate court decision subsequent to *Ralphs Grocery* continues to endorse it. (See *Ralphs Grocery Co. v. Victory Consultants, Inc.*, *supra*, 17 Cal.App.5th at p. 259.) In the absence of additional guidance from our Supreme Court, therefore, we will continue to adhere to that balancing formulation to analyze the scope of free speech rights on private property, except in the particularized context of private retail shops which is governed by the specific legal standard announced in *Ralphs Grocery* ("designed and furnished").

Balancing society's interest in free expression here against Park Management's interests as a private property owner, we conclude the unticketed, exterior portions of Six Flags Discovery Kingdom are a public forum.

Park Management's interest in restricting free expression in those areas is minimal. Those areas are large and freely open to the public. In addition, regardless of its reasons, Park Management has allowed Cuviello and other animal rights activists to peacefully protest there for at least seven years, which suggests a diminished interest in enforcing a private property right to exclude them. And although the exterior portion of the park does not offer the amenities of a busy railway station, a small group of people peacefully handing out leaflets and displaying posters there is not likely to interfere with the property's use. (See *Hoffman, supra*, 67 Cal.2d at p. 851.) On the contrary, it is undisputed these protesters caused no disruptions and did not interfere with park attendance.

By contrast, the public's interest in engaging in expressive activity in the exterior portions of Six Flags Discovery Kingdom is strong. The venue attracts up to 15,000 people daily, and the protesters' message is directly connected to the animal attractions featured at the park. In effect the protesters are urging a boycott, which is a traditional form of speech to which our state Constitution affords even greater protection than the First Amendment. (See *Fashion Valley Mall*, *supra*, 42 Cal.4th at pp. 867–868.) "According to our Supreme Court, '[u]rging customers to boycott a store lies at the core of the right to free speech.' " (*Best Friends Animal Society v. Macerich Westside Pavillion Property LLC* (2011) 193 Cal.App.4th 168, 175.) Yet there are no other areas

19

within the amusement park available for free expression, because the interior area is by ticketed admission only.[20]  And importantly, though not by itself dispositive, the park is zoned as "quasi-public," which under the local zoning code means it's a facility "of a public nature."  As discussed, that designation is not meaningless.  It implies the property has attributes in which the public has an interest, even if in private hands.  Whatever the precise contours of those attributes, the phrase "quasi-public" connotes some measure of yielding to individual rights of free expression.  (See *Albertson's*, *supra*, 107 Cal.App.4th at p. 119 [discussing when "private property is to be considered quasi-public property subject to the exercise of constitutional rights of free speech and assembly"].)  Then, of course, there is the fact that this amusement park falls within the same local zoning class as a traditional public park, and it is categorized in the city's general plan as falling within the same open space category as a community park.  While zoning laws alone do not define what is a public forum for constitutional free speech purposes, in combination with all of the other factors we have discussed they strongly suggest here the unticketed,

---

**20** Relegating the protesters to the public sidewalk is not an adequate substitute, a proposition Park Management does not seriously dispute.  Cuviello introduced uncontroverted evidence that only a very small number of park patrons enter from the sidewalk, whereas the vast majority of patrons drive onto property and park in its parking lot.  And when, after the issuance of a temporary restraining order, the protesters conducted their activities on the public sidewalk they distributed on average about 90 percent fewer flyers than when they had demonstrated on park property (averaging about 80 flyers in two hours compared with 800 to 1300 previously).  The right of free speech " 'is worthless in the absence of a meaningful method of expression' "; " 'it contemplates *effective* communication.' "  (*Van Nuys Pub. Co. v. City of Thousand Oaks* (1971) 5 Cal.3d 817, 821.)  In particular, leafletting on matters that are politically controversial " 'is the essence of First Amendment expression'; '[n]o form of speech is entitled to greater constitutional protection,' " and so restricting that mode of communication "imposes an especially significant First Amendment burden."  (*McCullen v. Coakley* (2014) 573 U.S. 464, 488–489; see also *Fashion Valley Mall*, *supra*, 2 Cal.4th at p. 869 ["The fact that speech may be convincing is not a proper basis for prohibiting it. . . . ' "Free trade in ideas" means free trade in the opportunity to persuade to action' "].)

exterior areas of this amusement park are open to the public "in the same manner as public streets or parks." (*Fashion Valley Mall*, *supra*, 42 Cal.4th at p. 859.)

Accordingly, for all of these reasons, we conclude the exterior, unticketed portions of the park are a public forum under California's liberty of speech clause.[21]

Ordinarily, that conclusion would not end the inquiry because expressive activity in a public forum may be restricted by reasonable "time, place and manner" restrictions. (See *Fashion Valley Mall*, *supra*, 42 Cal.4th at p. 870; *Pruneyard*, *supra*, 3 Cal.3d at p. 909; *Trader Joe's*, *supra*, 73 Cal.App.4th at p. 432.) In this case, however, Park Management does not defend its right to exclude Cuviello from its premises on the alternative ground that, even *if* the exterior portions of the amusement park are a public forum, its ban on expressive activity at any particular exterior location is a reasonable time, place and manner restriction (such as in the parking lot, or at any specific portion of the front entrance area). Nor did it raise such a theory in the trial court. Rather, it has staked the entire constitutional question on the public forum issue, just as it did below both in its own summary judgment motion and in opposition to Cuviello's cross-motion for summary judgment. With Park Management thus having litigated the constitutional

---

[21] We also note that for many years the amusement park had been municipally owned, and upon its conversion to private ownership it appears to have undergone no discernible change, either in purpose or in terms of at least its major physical characteristics. Moreover, after the City of Vallejo divested itself of title to the park in the wake of the adverse federal court ruling in the *Kuba* case, the City appears to have retained a significant, continuing financial stake in the amusement park and, to some degree, a measure of control (at least vis-à-vis a contractual commitment requiring the park to remain in operation for another decade as a condition of public financing). The parties have not ascribed any significance to these facts, however, and they were not a basis upon which Cuviello either sought or opposed summary judgment below, and so we do not rely on them in reaching our conclusion. We simply note that had the issue been briefed, and contrary to Park Management's refrain throughout its briefing that the property is privately owned, these facts would raise significant questions as to whether the technical transfer of title was of any constitutional significance. (See, e.g., *Summum v. Duchesne City* (10th Cir. 2007) 482 F.3d 1263, 1270–1271 and authorities cited, cert. granted and opinion vacated in *Duchesne City v. Summum* (2009) 55 U.S. 120)

21

issue as an all-or-nothing proposition, the question whether it may enforce its ban on expressive activity at any particular exterior location has been forfeited, and we will not consider that issue.

Accordingly, the trial court erred in granting Park Management's summary judgment and in denying Cuviello's cross-motion for summary judgment under article 1, section 2 of the California Constitution. And given our resolution of the state constitutional question, we do not reach the First Amendment issues raised by the parties.

To be clear, we do not hold that the exterior areas of all privately owned amusement parks or similar privately owned venues are public fora for free expression under California law. Each case is of course unique, and each turns on its particular facts. We merely hold on the undisputed facts here that Park Management may not ban expressive activity in the non-ticketed, exterior areas of Six Flags Discovery Kingdom.

## DISPOSITION

The judgment is reversed.

                                                            _____

                                                            STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*Park Management Corp. v. Cuviello* (A148425)

Trial Court:   Solano County Superior Court

Trial Judge:   Hon. Scott L. Kays

Counsel:

Joseph Cuviello, in pro. per., for Intervener and Appellant.

Amaro Baldwin, Michael L. Amaro, Sanaz Cherazaie for Plaintiff and Respondent.