**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BURT CAMENZIND, an individual, | No. 22-15931 |
| *Plaintiff-Appellant*, | D.C. No. |
| v. | 2:19-cv-00632-MCE-AC |
| CALIFORNIA EXPOSITION AND STATE FAIR; RICK PICKERING, in his official capacity as General Manager of California Exposition and State Fair, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted April 19, 2023
San Francisco, California

Filed October 31, 2023

Before: Lawrence VanDyke and Gabriel P. Sanchez,
Circuit Judges, and Robert S. Lasnik,[*] District Judge.

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

Opinion by Judge Sanchez;
Partial Dissent by Judge VanDyke

## SUMMARY[**]

### First Amendment/Public Fora

The panel affirmed the district court's summary judgment for defendants in an action alleging that state police officers violated the First Amendment and the Speech Clause of the California Constitution when they removed plaintiff Burt Camenzind from a privately organized Hmong New Year Festival at the state-owned California Exposition and State Fair ("CalExpo") for distributing religious tokens to attendees.

Officers told Camenzind that he could distribute his tokens in designated zones, referred to as Free Speech Zones, outside the entry gates but not inside the festival itself. Camenzind nevertheless purchased a ticket, entered the festival, began handing out tokens, and was subsequently ejected. He brought suit alleging that the Cal Expo fairgrounds, in their entirety, constitute a traditional "public forum," analogous to a public park, thereby entitling his speech to the most robust constitutional protections.

The panel first held that the enclosed, ticketed portion of the fairgrounds constituted a nonpublic forum under the United States Constitution and the California Speech Clause.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The space did not permit free access, its boundaries were clearly delineated by a fence, and no evidence suggested that access had previously been granted as a matter of course. The panel further noted that California courts have drawn distinctions between ticketed and unticketed portions of venues, and Camenzind pointed to no case holding that an enclosed area with a paid-entry requirement constitutes a public forum.

The panel determined that it need not decide whether the area outside the fence was a public forum under the First Amendment because the California Speech Clause provided independent support for Camenzind's argument that it was indeed such a forum, albeit subject to reasonable restrictions on speech. The panel concluded that the Free Speech Zones in the exterior fairgrounds were a valid regulation of the time, place, and manner of Camenzind's speech. The guidelines on distributing literature in the enclosed area were likewise permissible.

Dissenting in part, Judge VanDyke agreed with much of the majority's analysis, but did not think the majority properly applied California law to determine whether the area inside the fence was a public forum under the California Speech Clause, nor was the record sufficiently developed to make that determination. Accordingly, Judge VanDyke would remand for the district court to develop the record and properly answer that question.

**COUNSEL**

Matthew B. McReynolds (argued), Senior Counsel, and Kevin T. Snider, Chief Counsel, Pacific Justice Institute, Sacramento, California, for Plaintiff-Appellant.

David R. Norton (argued), Carl L. Fessenden, and Thomas L. Riordan, Porter Scott, Sacramento, California, for Defendants-Appellees.

**OPINION**

SANCHEZ, Circuit Judge:

Burt Camenzind visited the Hmong New Year Festival hoping to distribute religious tokens to attendees. The festival, a privately organized event, took place at the state-owned California Exposition and State Fair ("Cal Expo") fairgrounds in Sacramento County. Cal Expo police officers told Camenzind that he could distribute his tokens in designated zones, referred to as Free Speech Zones, outside the entry gates but not inside the festival itself. Camenzind nevertheless purchased a ticket, entered the festival, and began handing out the tokens. After the officers removed him from the fairgrounds, Camenzind brought this suit. He claims that Cal Expo's conduct violated the First Amendment of the United States Constitution and the Speech Clause of the California Constitution.

To resolve this case, we must decide whether Cal Expo constitutes a public forum under the federal or state constitutions when the property is being rented for a privately organized event, and, in light of that determination,

whether the restrictions imposed by Cal Expo were permissible.  Reviewing the district court's order de novo, *Donell v. Kowell*, 533 F.3d 762, 769 (9th Cir. 2008), we hold that the exterior, unticketed portion of Cal Expo is a public forum under the California Speech Clause and the interior, ticketed portion of the fairgrounds is a nonpublic forum.  We further hold that Cal Expo's Free Speech Zones were a valid regulation of Camenzind's speech in the exterior fairgrounds area and Cal Expo's prohibition on distributing literature in the enclosed area was likewise permissible. We therefore affirm the district court's order granting Cal Expo's motion for summary judgment.

## I.

## A.

Cal Expo is a sprawling event venue in Sacramento County owned and operated by the State of California. About half of the 800-acre property is surrounded by fencing and is accessible only through entry gates.  The fenced-in portion contains various indoor and outdoor event facilities. The area outside of the fence largely consists of parking lots and sidewalks leading to the gates.

For a few weeks each summer, Cal Expo hosts the California State Fair.  During the rest of the year, private organizations pay to rent Cal Expo facilities for trade shows and other events.  The private organizations usually charge attendees for admission or charge vendors to rent booths. The Cal Expo Police Department provides security for all events that take place on the grounds.

Cal Expo's Free Speech Activities Guidelines (the "Guidelines") govern all events at the fairgrounds.  The

Guidelines prohibit attendees from leafletting, picketing, or gathering signatures—collectively described as "free speech activities"—within the enclosed portion of the fairgrounds.[1] During the State Fair, anyone wishing to conduct "free speech activities" in the enclosed portion must purchase an exhibit space. For privately hosted events, "free speech activity is allowed only if that activity is allowed by the terms of the lease." Private-event organizers typically prohibit attendees from soliciting other attendees to preserve value for vendors who pay to rent booths.

The Guidelines also restrict free speech activities in the parking lots and on the sidewalks outside the fairgrounds fence. To "prevent[] . . . accidents or [traffic] congestion which could lead to injury," the Guidelines require "free speech activities" to be conducted in designated "Free Expression Zones" directly outside the entry gates. The Free

---

[1] The Guidelines define "Free Speech Activities" as follows:

> For purposes of these guidelines, "free speech activities" mean individual or group display of signs other than specifically allowed herein; picketing, leafleting, collection of signatures or marching and any group activity involving the communication or expression, either orally or by conduct of views and/or grievances, and which has the effect and intent or propensity to express that view or grievance to others. As used in these guidelines, neither the definition of or limitations on "free speech activities" includes one-on-one voluntary discussions or individual wearing of buttons or symbolic clothing.

The Cal Expo Code of Conduct similarly prohibits "[s]oliciting contributions or signatures, leafletting, picketing or displaying signs, posters or banners, except in designated areas as defined by the" Cal Expo Guidelines.

Expression Zones each span six feet by six feet and are available at no cost on a first-come, first-served basis. Anyone entering the enclosed portion of the fairgrounds must walk within a few dozen feet of the zones. The Guidelines do not restrict individuals from conducting one-on-one conversations or wearing "buttons or symbolic clothing" anywhere on the fairgrounds.

**B.**

The Sacramento Hmong New Year Organization ("SHNYO") leased the Cal Expo fairgrounds to host the 2018 Hmong New Year Festival. The festival took place over four days in the fall of that year and attracted nearly 30,000 attendees. Vendors paid to rent booths at the festival, and festival attendees were required to purchase a ticket for entry.

Camenzind, an Evangelical Christian, wanted to spread the message of his faith at the festival. He arrived at the fairgrounds wearing a vest covered in pockets, each filled with custom coins bearing biblical verses and other religious messages. Camenzind planned to distribute the coins to festival attendees. Many of the coins contained messages in Hmong and various other languages so that Camenzind could proselytize attendees who did not speak English.

The hundreds of coins bulging from Camenzind's pockets attracted the attention of Cal Expo police when he reached the entry gates. A Cal Expo police officer advised Camenzind that handing out his coins inside the festival would violate the Guidelines. The officer told Camenzind that he could distribute the coins from the Free Expression

Zones outside the entry gates.[2]      Camenzind declined, insisting that effective communication requires one-on-one conversations that he did not believe were possible from the designated zones.

Camenzind purchased a ticket, entered the fairground gates, and began distributing his coins to fairgoers. When Cal Expo police officers spotted him doing so, they ejected him from the property.

## C.

Camenzind filed a complaint in Sacramento County Superior Court alleging that Cal Expo's enforcement of the Guidelines and Code of Conduct, both facially and as applied to him, violated his rights under the First Amendment of the United States Constitution and the Speech Clause of the California Constitution. Cal Expo removed the case to the Eastern District of California. Following discovery, the district court granted Camenzind's motion for summary judgment on his as-applied challenge, finding that the police officer arbitrarily enforced the Guidelines because there was no individual registration requirement for using the Free Expression Zones. The district court, however, granted Cal Expo's motion for summary judgment on the facial challenge to the Guidelines, holding that the Guidelines did not violate Camenzind's right to free expression under the United States or California Constitution.

---

[2] The officer told Camenzind that he needed to fill out an application to use one of the Free Expression Zones. The parties agree the officer's statement was incorrect: the Cal Expo Guidelines only require applications for groups of twenty-five or more. Camenzind does not contend that the application requirement affected his decision not to use the Free Expression Zones.

In assessing Camenzind's argument that Cal Expo is a public forum, the court analyzed the fenced-in portion of the fairgrounds separately from the exterior portion. The court determined that the area outside of the fence—the parking lots and sidewalks leading up to the entry gates—constitutes a public forum under the California Speech Clause. The court then concluded that Cal Expo's establishment of Free Expression Zones near the entry gates was a permissible regulation of the time, place, and manner of speech. The court also determined that the enclosed area of the fairgrounds was not a public forum under either the United States or California Constitution. After determining that the Guidelines' prohibition on "free speech activities" inside the enclosed area was reasonable and content-neutral, the court concluded that Camenzind's rights were not violated. Because Cal Expo does not appeal the district court's ruling on Camenzind's as-applied challenge, only Camenzind's facial challenge to the Guidelines is before us.

## II.

The First Amendment reflects this country's "profound commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Even so, "protected speech is not equally permissible in all places and at all times." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985). "To ascertain what limits, if any, may be placed on protected speech, we have often focused on the 'place' of that speech, considering the nature of the forum the speaker seeks to employ." *Frisby v. Schultz*, 487 U.S. 474, 479 (1988).

Camenzind contends that the Cal Expo fairgrounds, in their entirety, constitute a "public forum," entitling his

speech to the most robust protection of the federal and state constitutions.    He also argues that Cal Expo's Free Expression Zones fail to survive the scrutiny we apply to speech regulations in such a forum.

To analyze his claims, we begin by "identify[ing] the nature of the forum, because the extent to which government may limit access depends on whether the forum is public or nonpublic." *Cornelius*, 473 U.S. at 797.    The First Amendment and California Speech Clause sometimes impose different tests for identifying public fora, *see Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004), and so we analyze the Cal Expo fairgrounds under each constitutional provision in turn.    Finally, we consider whether the restrictions on Camenzind's speech were permissible under the applicable forum analysis.

## A.

At the threshold, we must specify the contours of the forum at issue.  We define a forum based on the "access sought by the speaker." *Cornelius*, 473 U.S. at 801.  "When speakers seek general access to public property, the forum encompasses that property [as a whole].  In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." *Id.*; *accord Clark v. Burleigh*, 4 Cal. 4th 474, 484–85 (1992).

Camenzind contends that the forum in question is the entire 800-acre Cal Expo property.    But Camenzind's conduct at Cal Expo, along with his arguments throughout this litigation, indicate that he specifically sought access to the Hmong New Year Festival, an event that took place within the enclosed area of Cal Expo.  Camenzind alleged in his complaint that "he went to Cal Expo to attend the

[Hmong New Year] celebration and interact with fellow attendees." He refused to distribute his coins from the designated zones outside the gates. At oral argument, Camenzind's counsel repeatedly declined to identify any exterior area that Camenzind wanted to access.

At the same time, Camenzind also claims that the Free Expression Zones, which are located outside the entry gates, impermissibly limited his ability to interact with fairgoers. Camenzind further alleges that he sought access to the exterior portion after Cal Expo officers ejected Camenzind from the fairgrounds, asking them if he could distribute his coins outside the gates as a fallback option. Cal Expo officers denied his request and "informed him that he must leave the grounds entirely."[3]

Because Camenzind appears to challenge Cal Expo's regulation of free speech both within and outside the fairgrounds, we analyze both sets of challenges. Like the district court, we assess the two parts of the property separately. The areas are separated by a physical barrier and are governed by different policies. Each area therefore requires distinct analysis. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983) ("[T]he First Amendment [does not] require[] equivalent access to all parts of a . . . building . . . ."); *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992) ("[S]eparation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction.").

---

[3] The Guidelines state that "[a]ny violation . . . will result in a person already admitted to Cal Expo to leave the facility grounds without refund, liability, or compensation."

**B.**

We turn next to the question of whether the forum was public. "The standard under the California Constitution for whether a particular area is a 'public forum' is one aspect of constitutional law in which the California Constitution varies from its federal cousin." *Kuba*, 387 F.3d at 856. We therefore consider the question under each constitutional provision in turn, beginning with the First Amendment.

**1.**

The First Amendment affords special protection to "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry*, 460 U.S. at 45. Such areas, called "public fora," facilitate the free exchange of ideas essential to our democracy. *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Traditional examples of public fora include streets, parks, and sidewalks—publicly owned spaces which, for "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)); *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 569 (9th Cir. 1984). The government may also create new public fora by intentionally designating properties for expressive purposes. *See Pleasant Grove*, 555 U.S. at 469. "Examples of designated public fora include university meeting facilities, school board meetings, and municipal theaters." *Koala v. Khosla*, 931 F.3d 887, 900 (9th Cir. 2019). In both traditional and designated public fora, "the government may impose reasonable time, place, and manner restrictions on speech,

but content-based restrictions must be viewpoint neutral and satisfy strict scrutiny review." *Id.*

Nonpublic fora, in contrast, "are areas that do not, by tradition or designation, serve as a forum for public communication." *Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008). "Examples of nonpublic fora include airport terminals, highway overpass fences, and interstate rest stop areas (including perimeter walkways)." *Ctr. for Bio-Ethical Reform, Inc. v. City & Cnty. of Honolulu*, 455 F.3d 910, 919 (9th Cir. 2006) (citations omitted). "In a nonpublic forum, . . . the government has much more flexibility to craft rules limiting speech." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). After all, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property." *Cornelius*, 472 U.S. at 799–800.

Camenzind contends that the Cal Expo fairgrounds are a "traditional" public forum, analogous to a public park. He points out that Cal Expo was established under state law as part of the state parks system. *Cf.* CAL. FOOD & AGRIC. CODE §§ 3304–05. Drawing on language from Cal Expo's website, he says that the property was created "as a gathering place for Californians of all backgrounds." *Cf. About Us*, CAL. EXPO STATE FAIR, https://calexpostatefair.com/about-us [https://perma.cc/U8BH-5PZV].

When determining whether a location is a traditional public forum for First Amendment purposes, we consider: "(1) 'the actual use and purposes of the property, particularly status as a public thoroughfare and availability of free public access to the area,' (2) 'the area's physical characteristics, including its location and the existence of clear boundaries

deliming the area,' and (3) 'traditional or historic use of both the property in question and other similar properties.'" *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1135 (9th Cir. 2011) (quoting *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1100–01 (9th Cir. 2003)); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1045 (9th Cir. 2018).

None of the factors weighs in favor of treating the enclosed portion of the fairgrounds as a traditional public forum.  First, the space does not serve as a public thoroughfare, and Cal Expo does not permit free public access to it.  For most of the year, the fairgrounds remain locked and inaccessible until leased by a private party.  And leasing the property is not free—the SHNYO had to pay about $10,000 per day for that privilege.  Even during the few weeks that Cal Expo hosts the State Fair, the property is open only during limited hours.  Patrons must also generally pass through a security checkpoint and purchase a ticket to gain entry.  The property is thus in no sense "continually open" to the public as, for example, a park or public square. *See United States v. Kokinda*, 497 U.S. 720, 727 (1990) (quoting *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981)); *see also Perry*, 460 U.S. at 47 ("[S]elective access does not transform government property into a public forum.").  Second, the boundaries of the space are clearly marked by the fencing surrounding it. The fencing "proscrib[es] access to" the property "and clearly indicate[s] to the public" that the space is "not intended for the exercise of First Amendment rights." *Wright*, 665 F.3d at 1136.  Third, no evidence suggests that "access to [the forum] ha[s] been granted as a matter of course to all who s[eek] to distribute material."   *Id.* (discussing *Perry*, 460 U.S. at 47–48).  On the contrary, the

Cal Expo has a policy of allowing only "reasonable access to its grounds and designated free speech expression zones for demonstrations for free speech activity." We thus conclude that the enclosed area of Cal Expo is not "traditionally open to expressive activity." *Kokinda*, 497 U.S. at 727.

The exterior portion of the fairgrounds presents a closer question. Camenzind does not specify which parts of the 400-acre property outside the fence he believes are analogous to a public park. Some areas outside the fence include roadways and sidewalks, which generally occupy "a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." *McCullen*, 573 U.S. at 476 (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). Still, not all roadways and sidewalks are the same. In *United States v. Kokinda*, the Court held that a sidewalk leading from a parking lot to the front door of a Postal Service building lacked "the characteristics of public sidewalks traditionally open to expressive activity." 497 U.S. at 727. As in *Kokinda*, the sidewalks at Cal Expo seem "constructed solely to assist [Cal Expo] patrons to negotiate the space between the parking lot and the [entry gate]." *Id.* at 728.

On the other hand, some areas outside the fence are, at the very least, *designated* public fora. "The government creates a designated public forum when it intends to make property that hasn't traditionally been open to assembly and debate 'generally available' for 'expressive use by the general public or by a particular class of speakers.'" *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 496 (9th Cir. 2015) (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 667–68 (1998)). Here, Cal Expo created Free Expression Zones for expressive use by the

general public.  Those zones, which take up several hundred feet outside the entry gates, undoubtedly constitute public fora.

In any event, we need not decide whether the area outside the fence is a public forum under the First Amendment.  As we discuss below, the California Speech Clause provides "independent support" for Camenzind's argument that it is indeed such a forum, *Kuba*, 387 F.3d at 856 (quoting *Carreras v. City of Anaheim*, 768 F.2d 1039, 1042 (9th Cir. 1985)), albeit subject to reasonable restrictions on speech.  We therefore "avoid the determination of [the] federal constitutional issue[]."  *Id.* We conclude that the enclosed portion of Cal Expo, during the Hmong New Year Festival, was a nonpublic forum under the United States Constitution.

**2.**

The California Speech Clause provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press." CAL. CONST. art. I, sec. 2(a).  "California Courts have developed an extensive body of case law addressing whether the government regulation of speech in certain locations violates" that clause.  *Int'l Soc. for Krishna Consciousness of Cal. Inc. v. City of Los Angeles*, 530 F.3d 768, 774 (9th Cir. 2008), *certified question answered* 48 Cal. 4th 446, 227 P.3d 395 (2010).  "Nonetheless, there is still some confusion about how properly to articulate California's public forum test." *Id.*

In some settings, the California Speech Clause treats privately controlled properties as public fora.  For example, although privately owned shopping centers are not public

fora for purposes of the First Amendment, the California Supreme Court has recognized them as such under the California Speech Clause. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81 (1980); *San Leandro Tchrs. Ass'n v. Governing Bd. of San Leandro Unified Sch. Dist.*, 46 Cal. 4th 822, 842 (2009). In reaching that conclusion, the California Supreme Court reasoned:

> A privately owned shopping center may constitute a public forum under the [California] Constitution because of the growing importance of the shopping center as a place for large groups of citizens to congregate and to take advantage of the numerous amenities offered there, and also because of the public character of the shopping center, which is a result of the shopping center's owner having fully opened his property to the public.

*Ralphs Grocery Co. v. United Food & Com. Workers Union Loc. 8*, 55 Cal. 4th 1083, 1091 (2012) (internal quotation marks omitted) (quoting *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 907, 910 & n.5 (1979), *aff'd* 447 U.S. 74 (1980)).

The state supreme court has nevertheless "stressed that 'those who wish to disseminate ideas' in shopping centers do not 'have free rein.'" *Id.* (quoting *Pruneyard*, 23 Cal. 3d at 910). And more recently, the court "held that the *entrance* to an *individual store* within a privately owned shopping center is not a public forum." *Park Mgmt. Corp. v. In Def. of Animals*, 36 Cal. App. 5th 649, 660 (2019) (citing *Ralphs Grocery*, 55 Cal. 4th at 1093).

Outside of shopping centers, "California's public forum test, and how that test differs from its federal counterpart, are not abundantly clear." *Int'l Soc. for Krishna Consciousness of Cal. Inc.*, 530 F.3d at 775. In *Golden Gateway Center v. Golden Gateway Tenants Association*, a divided California Supreme Court held that a privately owned apartment complex was not a public forum. 26 Cal. 4th 1013, 1016 (2001). A majority of the court distinguished *Pruneyard*, holding that the apartment complex was "not the functional equivalent of a traditional public forum" because it was not "freely and openly accessible to the public." *Id.* at 1032–33; *see also id.* at 1038 (George, C.J., concurring). A plurality of the court would have narrowed *Pruneyard* further, reasoning that "California's free speech clause contains a state action requirement." *Id.* at 1023 (plurality opinion of Brown, J.). No justice articulated a "precise standard to judge whether private property constitutes a public forum for free speech purposes under California's Constitution." *Park Mgmt. Corp.*, 36 Cal. App. 5th at 659.

The California standard for analyzing government-owned fora is similarly elusive. In the 1980s, one state appellate court announced that "the label 'public forum' cannot be applied mechanically," and instructed that government-owned properties must be assessed on "a continuum, with public streets and parks at one end and government institutions like hospitals and prisons at the other." *U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Lab'y*, 154 Cal. App. 3d 1157, 1163–64 (1984). The "test" under California law, that court concluded, was whether the communicative activity "is basically incompatible with the normal activity of a particular place at a particular time." *Id.* at 1168 (citation omitted).

We dutifully adopted this "basic incompatibility" test, *see Carreras*, 768 F.2d at 1045, and attempted to apply it for decades. *See, e.g.*, *Kuba*, 387 F.3d at 856–57; *Cuviello v. City of Vallejo*, 944 F.3d 816, 826 (9th Cir. 2019). California courts, meanwhile, seem to have immediately abandoned the test. *See San Leandro Tchrs. Ass'n*, 46 Cal. 4th at 845 (recognizing that the "basic incompatibility test has not been found in California appellate cases since *U.C. Weapons Labs*" was announced). And in 2009, the California Supreme Court declined to adopt the "basic incompatibility" test, acknowledging flaws in its reasoning. *Id.*[4] Thus, our cases applying the test, which Camenzind urges us to follow, stand on what appears to be a hollow foundation.

Fortunately, a closely analogous California Court of Appeal decision provides a path for assessing the forum at issue in this case. *See T-Mobile USA Inc. v. Selective Ins. Co. Am.*, 908 F.3d 581, 586 (9th Cir. 2018) ("An intermediate state appellate court decision . . . is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would

---

[4] *U.C. Weapons Labs* borrowed the "basically incompatible" language from *Grayned v. City of Rockford*, 408 U.S. 104 (1972). *See U.C. Weapons Labs*, 154 Cal. App. 3d at 1168 (citing *Grayned*, 408 U.S. at 116); *see also Prisoners Union v. Dep't of Corr.*, 135 Cal. App. 3d 930, 935 (1982) (same). In *San Leandro Teachers Association v. Governing Board of the San Leandro Unified School District*, the California Supreme Court pointed out that *Grayned* did not use "the concept of 'basic incompatibility'" to determine whether a location was a public forum. 46 Cal. 4th at 845 (quoting *Grayned*, 408 U.S. at 116). Rather, the basic incompatibility test was used in *Grayned* "to determine whether [the challenged] regulation constitute[d] a reasonable time, place or manner restriction"—that is, the test applied only "*after* it ha[d] been decided that the government property in question [was] a public forum." *Id.* (emphasis added).

decide otherwise." (quoting *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir. 1982))). In *Park Management Corp. v. In Defense of Animals*, the court considered whether Six Flags Discovery Kingdom constituted a public forum under the California Speech Clause. 36 Cal. App. 5th at 654. Several important aspects of the Six Flags property match the Cal Expo fairgrounds: "the [Six Flags] amusement park consists of a ticketed interior portion where the entertainment activities are located, accessible through a single point of entry and exit, and an exterior portion" made up of parking lots and walkways leading to the admissions area. *Id.* at 653.

Recognizing that "the California Supreme Court's decisions in this area are hard to synthesize," *id.* at 661, the *Park Management* court employed a balancing test based on its survey of other state appellate court decisions. *Id.* at 664. The court weighed "society's interest in free expression" against the park-management corporation's "interests as a private property owner," to "conclude the *unticketed, exterior* portions of the Six Flags Discovery Kingdom are a public forum." *Id.* (emphasis added). Necessary to the court's conclusion was its observation that there were "no other areas within the amusement park available for free expression, because the interior area is by ticketed admission only." *Id.* at 665.

*Park Management* teaches that the exterior, unticketed portions of the Cal Expo constitute a public forum under the California Speech Clause. *Id.* at 664. Cal Expo, for its part, concedes as much. "[T]he public's interest in engaging in expressive activity in the exterior portions of [the Cal Expo] is strong" due to the significant volume of pedestrian traffic, *id.* at 665, with the 2018 Hmong New Year Festival alone attracting nearly 30,000 attendees. In comparing the public's interest with that of the property holder, Cal Expo's

stated mission remains public oriented "as a place to celebrate California[] . . . [and the] diversity of its people, traditions and trends." *About Us*, CAL. EXPO STATE FAIR. The exterior area of the Cal Expo is "large and freely open to the public," akin to the exterior portions of the amusement park in *Park Management*. *Park Mgmt. Corp.*, 36 Cal. App. 5th at 665. Similarly, Camenzind "handing out [coins] there is not likely to interfere with the property's use." *Id.* While the amusement park in *Park Management* had allowed activists to protest peacefully on its property for years, Cal Expo's establishment of the Free Expression Zones analogously "suggests a diminished interest in enforcing a private property right to exclude" Camenzind's speech from the entirety of its grounds. *Id.*

*Park Management*'s distinction between ticketed and unticketed portions of a property is also dispositive in assessing the nature of the enclosed portion of the Cal Expo fairgrounds. Here, the interior, ticketed portion of the fairgrounds is the exact type of forum that *Park Management* stated was unavailable for free expression. *Id.* The California Supreme Court has likewise recognized the distinction between ticketed and unticketed sections of a forum. In *International Society for Krishna Consciousness of California Inc. v. City of Los Angeles*, 530 F.3d 768 (9th Cir. 2008), we certified a question to the California Supreme Court, asking whether Los Angeles International Airport constituted a public forum under the California Speech Clause. The California Supreme Court declined to assess the airport as a whole, and instead analyzed only the portions of the airport that were accessible by the general public—that is, the court did not consider the parts of the airport that were accessible only by ticketed passengers. *See Int'l Soc'y for Krishna Consciousness of Cal.*, 48 Cal. 4th at 460; *see also*

*id.* at 461 (Kennard, J., concurring) ("More precisely, the question is whether the areas of that airport that are accessible to the general public—excluding areas reserved for ticketed passengers who have passed through security screening—are public forums.").

Camenzind points us to no case holding that an enclosed area with a paid-entry requirement constitutes a public forum.  The cases on which he principally relies, our decisions in *Carreras* and *Kuba*, analyzed only exterior, freely accessible spaces.  *See Carreras*, 768 F.2d at 1045 (holding that "the *exterior* walkways and parking areas of Anaheim Stadium and the Anaheim Convention Center" are public fora (emphasis added)); *Kuba*, 387 F.3d at 857 (same for "the parking lots and . . . walkways *around* the Cow Palace" (emphasis added)).  Even in the shopping-center context, the California Supreme Court has drawn analogous distinctions.  *See Ralphs Grocery*, 55 Cal. 4th at 1092 ("[W]ithin a shopping center or mall, the areas outside individual stores' customer entrances and exits, at least as typically configured and furnished, are not public forums . . . .").

Absent controlling authority from the state supreme court, "a federal court must 'predict how the highest state court would decide the [state law] issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'" *Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1131–32 (9th Cir. 2021) (quoting *Judd v. Weinstein*, 967 F.3d 952, 955–56 (9th Cir. 2020)).  Given the distinction drawn by California courts between ticketed and unticketed portions of venues, and in particular the analysis by the California Court of Appeals in *Park Management*, we hold that the enclosed portion of Cal Expo during the Hmong New Year Festival did not

constitute a public forum under the California Speech Clause. The area outside the Cal Expo fence, however, did constitute a public forum under that clause.

## III.

We finally consider whether the restrictions on speech in the forum were permissible. As discussed above, the exterior, unticketed portion of Cal Expo is a public forum under the California Speech Clause. The interior, ticketed portion of the fairgrounds is a nonpublic forum under the First Amendment and the California Speech Clause.

We conclude that the Free Speech Zones were a valid regulation of Camenzind's speech in the exterior fairgrounds area. In a public forum, "the government may impose reasonable restrictions on the time, place, or manner of protected speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Time, place, or manner regulations "must be content neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the message." *Galvin v. Hay*, 374 F.3d 739, 752 (9th Cir. 2004) (quoting *United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999)); *see Kuba*, 387 F.3d at 857–58 (recognizing that the same requirements apply under the California Speech Clause). The zones fulfill all those requirements.

Camenzind concedes that the Free Expression Zones are content-neutral because they are allocated on a first-come, first-served basis. The zones also serve a substantial government interest: public safety. In the exterior area, pedestrian activity is generally confined to narrow walkways to and from the parking areas. The Free Speech Zones serve the "substantial state interest" of preventing congestion in that area by "confining distribution, selling, and fund

solicitation activities to fixed locations." *Heffron*, 452 U.S. at 654; *see Kuba*, 387 F.3d at 858. From the Free Speech Zones, Camenzind would have been able to distribute his coins while not blocking the narrow walkways and causing attendees to stray into adjoining parking lots with automobile traffic. The zones are adequately tailored because they do not "burden substantially more speech than is necessary" to achieve the government's public-safety interest. *Ward*, 491 U.S. at 799. The zones are positioned next to the entry gates—a prime location that provides speakers with exposure to virtually everyone who enters the fairgrounds. Camenzind points to nowhere in the exterior area that he would find preferable. We therefore conclude that Cal Expo's Free Expression Zones were a permissible regulation of the time, place, and manner of Camenzind's speech.

The Guidelines' prohibition on distributing literature in the enclosed area was likewise permissible. In a nonpublic forum, speech restrictions "need only be 'reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008) (quoting *Perry*, 460 U.S. at 46); *see Rosenberger v. Rector & Visitors of the Univ. of Vir.*, 515 U.S. 819, 829 (1995).

Cal Expo, like any event-venue owner, makes the facilities inside the gates attractive by offering lessees the freedom to control them. A couple in search of a wedding venue, for example, would be uneager to book a property where they could not exclude an uninvited uncle. By allowing the lessee to set the rules for their events—and by enforcing those rules—Cal Expo adds value for such customers. We think it perfectly reasonable for Cal Expo to have done so here. *See Kokinda*, 497 U.S. at 725 ("It is a

long-settled principle that governmental actions are subject to a lower level of First Amendment scrutiny when 'the governmental function operating is . . . as [a] proprietor to manage its internal operations.'" (alterations and punctuation mark omitted) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896 (1961))).

At bottom, we have little difficulty concluding that the government's actions were reasonable and not aimed at suppressing Camenzind's viewpoint.

## CONCLUSION

For the reasons above, we affirm the district court's order granting Appellees' motion for summary judgment.

**AFFIRMED**.

VANDYKE, Circuit Judge, dissenting in part:

This case asks us to determine whether, under either the First Amendment or the California Speech Clause, a publicly owned facility may constitute a private forum when it is rented out to private organizations. Because we do not have enough information to properly evaluate whether Cal Expo is a public forum during the Hmong New Year Festival under the California Speech Clause, I would remand for further factual development.

I agree with much of the majority's analysis. First, I agree that we should analyze Cal Expo's regulation of speech inside and outside the fenced-in section of the fairgrounds separately. Second, I agree with the majority's analysis of regulations outside the fence under both the First Amendment and the California Speech Clause, and that in

the end, those regulations are valid time, place, and manner restrictions.  Finally, I agree that the area inside the fence is not a traditional public forum for First Amendment purposes.

But I depart from the majority's analysis of the regulations within the fence under the California Speech Clause.  I do not think the majority properly applied California law to determine whether the area inside the fence is a public forum, and I do not think the factual record is developed enough for us to determine whether the fenced-in area is a public forum under the California Speech Clause.  Accordingly, I would remand for the district court to develop the record and properly answer that question.

"The California Constitution provides protections for speakers in some respects broader than provided by the First Amendment of the Federal Constitution." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004).  The California Speech Clause is "more definitive and inclusive than the First Amendment" because it does not "couch[] the right to free speech as a limit on congressional power."  *Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*, 26 Cal. 4th 1013, 1019 (2001).  As the majority explains, one area where the California Speech Clause differs from the First Amendment is the standard under which a particular area is determined to be a public forum (or not).  *Kuba*, 387 F.3d at 856.

Under the California Speech Clause, "the 'public forum' doctrine is not limited to traditional public forums such as streets, sidewalks, and parks, or to sites dedicated to communicative activity." *Carreras v. City of Anaheim*, 768 F.2d 1039, 1045 (9th Cir. 1985).  Instead, "private property that [is] open to the public in the same manner as public

streets or parks could constitute a public forum for free expression." *See Fashion Valley Mall, LLC v. Nat'l Lab. Rel. Bd.*, 42 Cal. 4th 850, 859 (2007). Under this standard, private properties like shopping malls, railway terminals, or sidewalks outside businesses may be deemed public forums under the California Speech Clause. *Park Mgmt. Corp. v. In Def. of Animals*, 36 Cal. App. 5th 649, 659–60 (Cal. Ct. App. 2019).

Though the test is clearly broader than the public forum analysis under the First Amendment, "[t]he California Supreme Court has not articulated a precise standard to judge whether private property constitutes a public forum for free speech purposes under California's Constitution." *Id*. at 659. Our court has applied the "basic incompatibility" test explicated by one state appellate court, which asks whether the proposed communicative activity "is basically incompatible with the normal activity of a particular place at a particular time." *Carreras*, 768 F.2d at 1045 (quoting *Univ. of Cal. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Lab'y*, 154 Cal. App. 3d 1157, 1164, 1168 (Cal. Ct. App. 1984)). But as the majority correctly observes, that test was never adopted by the California Supreme Court. *See San Leandro Teachers Ass'n v. Governing Bd. of San Leandro Unified Sch. Dist.*, 46 Cal. 4th 822, 845 (2009). And I agree that our court has probably been misapplying California law in our cases applying that test.

Instead, the California Supreme Court has provided some guideposts, rather than bright-line rules, for when private property constitutes a public forum. For example, in *Golden Gateway Center*, the California Supreme Court looked at the extent to which a privately owned apartment complex "restricts the public's access to the Complex,"

versus the extent to which "the property is freely and openly accessible to the public."  26 Cal. 4th at 1033.  And in *Ralph's Grocery Co. v. United Food & Commercial Workers Union Local 8*, the California Supreme Court contrasted "shopping centers' common areas, which generally have seating and other amenities producing a congenial environment that encourages passing shoppers to stop and linger, to leisurely congregate for purposes of relaxation and conversation," with areas immediately adjacent to individual store entrances, which "typically lack seating and are not designed to promote relaxation and socializing."  55 Cal. 4th 1083, 1092 (2012).  Areas with the "utilitarian purposes of facilitating customers' entrance to and exit from the stores" are not public forums, the California Supreme Court explained, but areas "designed and furnished in a way that induces shoppers to congregate for purposes of entertainment, relaxation, or conversation" are.  *Id*. at 1093. So various factors play into whether a private area is open to the public in the same manner as public streets or parks and thus constitutes a public forum under the California Constitution.

The California Supreme Court has not, however, pronounced a test like that adopted by the majority in this case.  According to the majority, any "enclosed area with a paid-entry requirement" is not a public forum under California law.  But while a ticketed-entry test may be an administrable bright-line rule, and thus one the California courts could consider adopting, that test appears neither in the cases the majority cites for it nor in any decisions of the California Supreme Court.  It is true that a couple California cases factually involved ticketed and unticketed areas, but in none of those cases did the courts' analysis rely on that distinction.  In my view, the majority here—much like it

suggests our court previously did in *Carreras*—adopts a test that is unsupported by the California Supreme Court's caselaw. But worse than in *Carreras*, the test adopted by the majority today is not supported by *any* California court, not even a single intermediate court of appeals decision. We are effectively making California constitutional law from scratch.

Consider *International Society for Krishna Consciousness of Cal. v. City of Los Angeles*, 48 Cal. 4th 446 (2010). In that case, the California Supreme Court was tasked with determining whether a prohibition on solicitation at the Los Angeles International Airport violated the California Speech Clause. *Id*. at 449. The court refused to determine whether the airport was a public forum because the regulation was valid either way. *Id*. at 453 ("[W]e do not determine whether Los Angeles International Airport is a public forum under the liberty of speech clause of the California Constitution …."). Granted, as the majority notes, the court concluded that the regulation was valid "even if those areas of Los Angeles International Airport that are open to the general public are public forums" and did not seem to consider the secure (i.e., "ticketed") sections of the airport. *Id*. at 460. But the opinion nowhere says that the secure, ticketed sections of the airport *were not* public forums. Rather, it never analyzed those areas at all. So *International Society for Krishna Consciousness* does not support the majority's rule that ticketed areas are necessarily not public forums under California law.

*Park Management* is similar. As the majority explains, that case considered whether Six Flags Discovery Kingdom—which, like Cal Expo here, included both a ticketed portion and an exterior parking and admissions area—was a public forum. 36 Cal. App. 5th at 653. But

again, it does not support the majority's categorical test. First, that court had no occasion to pass on the legality of speech restrictions in ticketed areas because the protest there occurred *outside* the entrance to Six Flags, not beyond the ticket booth. *Id*. at 656 ("[A]pproximately eight people protested … at the park's front entrance area, and a ninth person handed out leaflets in the parking lot."). Second, the court, after reviewing California Supreme Court cases and the decisions of other intermediate appellate courts, applied an interest balancing test to determine whether the entrance area and parking lot were public forums. *Id*. at 664. It noted that factors included "the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants." *Id*. (quoting *Van v. Target Corp.*, 155 Cal. App. 4th 1375, 1384 (Cal. Ct. App. 2007)). It simply had no reason to analyze whether the ticketed part of Six Flags was a public forum under California law.

While the majority is correct that Camenzind "points us to no case holding that an enclosed area with a paid-entry requirement constitutes a public forum" under California law, the majority points to no case holding the opposite, either. My own reading of California cases suggests that California's test is more complicated, and less categorical, than the majority would hold. I would instead look to the various factors considered by the California Supreme Court in other cases, helpfully outlined by *Park Management*. *See* 36 Cal. App. 5th at 664.

But the record in this case is currently insufficient to consider those factors because the answer could very well be different based on what type of event is occurring on Cal Expo's property.

A few examples illustrate this.  First, consider a scenario where a private company rents out Cal Expo for a company picnic.  No entry fee is required, but only employees of the company and their families are invited to attend.  None of the relevant factors would point toward Cal Expo being a public forum in that instance, because it is in no way held open to the public.  *Cf. Golden Gateway*, 26 Cal. 4th at 1033 (concluding that an apartment complex was not a traditional public forum under the California Constitution because access is limited to residential tenants and their invitees).  The fact that an entry fee is not charged would not be dispositive in that instance.

Second, imagine that a local farmers' association rents out Cal Expo once a week for its farmers' market.  The vendors each pay to rent a booth, but no admission fee is charged, and they hold themselves out as open to the public, who they hope will come in to buy their goods.  The market has an open mic for music and tables for people to sit at and enjoy their produce.  The association advertises the market in local papers and online as a place to sit, relax, and shop.  This would presumably be a public forum under the California Free Speech Clause, akin to a shopping center. *Ralph's Grocery Co.*, 55 Cal. 4th at 1092.  Indeed, the only relevant difference between this example and the type of shopping centers that California courts have concluded are public forums is that Cal Expo is publicly owned property, which presumably would cut more in favor of it being considered a public forum under California law.

Now consider this same example, but imagine the same market requires a small fee—say, a canned good as a donation to charity—to enter.  The farmers' market is still held open to the public.  Indeed, the whole purpose of the market is to allow the vendors to sell their produce to the

public broadly.   The event also continues to provide gathering areas where attendees can "leisurely congregate for purposes of relaxation and conversation." *Id*.  It seems to me that this example presents the paradigm of what California courts have deemed a public forum, except for the wrinkle of the small entrance fee.  It is hard to see how the small fee would necessarily outweigh *all of the other factors* that make the farmers' market akin to a traditional public forum under California law.  That is not what I would predict California courts would conclude based on reading their (admittedly not directly on-point) precedent.

Here, we are tasked with determining whether the application of Cal Expo's policy to Camenzind *during the Hmong New Year Festival* was contrary to the California Speech Clause.  But beyond the requirement that attendees had to purchase tickets to enter and vendors paid to rent booths, we know very little about the festival.  If the festival is exclusive in some important respects (which seems unlikely given that the event attracted nearly 30,000 participants), it might be more like the company picnic example above, and thus not a public forum.  But if the festival allows any member of the public to buy a ticket (which seems most likely), and inside includes areas for visitors "to stop and linger, [and] to leisurely congregate for purposes of relaxation and conversation," it might be more like the farmers' market example above—its entrance fee notwithstanding.  *Ralph's Grocery Co.*, 55 Cal. 4th at 1092. Without additional facts, which I cannot find in the record, we cannot properly evaluate where this event falls on the spectrum.  But what I am sure of is that ticketing alone is not the touchstone California law requires.

I thus respectfully dissent insofar as the majority affirms the district court's order granting summary judgment on the

California Speech Clause cause of action regarding the fenced-in section of Cal Expo.